**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**Case No.:** _____

STEVEN J. RUBINSTEIN and
TRACEY F. RUBINSTEIN, as trustees for
THE RUBINSTEIN FAMILY LIVING
TRUST DATED 6/25/2010, and
CARY B. TOONE, individually and
FBO CARY B. TOONE IRA,
RONALD WEBB, individually and
FBO RONALD WEBB IRA,
JUDITH TUGGLE, individually,
GEORGIA F. MURPHY, individually,
HAROLD HAMMON, individually and
FBO HAROLD HAMMON IRA,
and on behalf of all others similarly situated,

      Plaintiffs,

v.

EQUIALT, LLC,
an Arizona limited liability company,
EQUIALT FUND, LLC,
a Nevada limited liability company,
EQUIALT FUND II, LLC,
a Nevada limited liability company,
EQUIALT FUND III, LLC,
a Nevada limited liability company,
EA SIP, LLC,
a Nevada limited liability company,
BRIAN DAVISON, a Florida individual,
BARRY RYBICKI, a Florida individual,
TONY JAMES MICHAEL KELLY, a Florida individual,
FAMILY TREE ESTATE PLANNING, LLC,
an Arizona limited liability company,
JASON PAUL WOOTEN, an Arizona individual,
TIM LADUCA, an Arizona individual,
AMERICAN FINANCIAL SECURITY, LLC,
an Arizona limited liability company,
AMERICAN FINANCIAL INVESTMENTS, LLC,
an Arizona limited liability company,
RONALD F. STEVENSON, an Arizona individual,

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

JOSEPH FINANCIAL INVESTMENT ADVISORS, LLC,
a California limited liability company, and
ROBERT JOSEPH ARMIJO, a California individual,

     Defendants.

_____/

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Steven J. Rubinstein and Tracey F. Rubinstein, individually and in their capacity as trustees for The Rubinstein Family Living Trust Dated 6/25/2010 (the "Rubinstein Trust") (collectively, the "Rubinstein Plaintiffs"), Cary B. Toone ("Toone"), individually and for the benefit of the Cary B. Toone IRA ("Toone IRA"), Ronald Webb ("Webb"), individually and for the benefit of the Ronald Webb IRA ("Webb IRA"), Judith Tuggle ("Tuggle"), individually, Georgia F. Murphy ("Murphy"), individually, and Harold Hammon, individually ("Hammon") and for the benefit of the Harold Hammon IRA ("Hammon IRA") (together, "Plaintiffs"), on behalf of themselves and all others similarly situated, sue EquiAlt, LLC ("EquiAlt"), EquiAlt Fund, LLC ("Fund 1"), EquiAlt Fund II, LLC ("Fund 2"), EquiAlt Fund III, LLC ("Fund 3"), EA SIP, LLC ("EA SIP Fund"), Brian Davison ("Davison"), a Florida individual, Barry Rybicki ("Rybicki"), a Florida individual, Tony James Michael Kelly, a Florida individual ("Kelly"),[1] Family Tree Estate Planning, LLC, an Arizona limited liability company ("Family Tree"), Jason Paul Wooten, an Arizona individual ("Wooten"), Tim LaDuca, an Arizona individual ("LaDuca"), American Financial Security, LLC, an Arizona limited liability company ("American Security"), American Financial Investments, LLC, and Arizona limited liability company ("American Investments"),

---

[1] Upon careful review of the injunction entered by the Honorable Court in the SEC Action, that order not appear to bar any person from proceeding against EquiAlt, the Funds, or the EquiAlt Principals. *See SEC v. Davison, et al.*, No. 8:20-cv-00325-MSS-AEP (M.D. Fla.), at ECF No. 10 (the "SEC Action"). Should that Court enter an order enjoining any such claims during the pendency of the receivership, Plaintiffs will certainly abide by that Court's rulings and proceed solely against the other parties named herein.

Ronald Stevenson ("Stevenson"), Joseph Financial Investment Advisors, LLC ("Joseph Financial") and Robert Joseph Armijo ("Armijo"), and states:

## INTRODUCTION

1.      This is unfortunately a very familiar fact pattern, especially here in Florida. EquiAlt and its principals and officers, along with some very prominent aiding and abettors, scammed more than 1,100 mostly senior citizens from across the country of much of their life savings. Most of the investors were senior citizens, mainly from Florida, Arizona and California, that all invested and lost more than $170 million dollars in this fraud. Evidence already uncovered reveals that defendants conducted a classic Ponzi scheme, as explained in detail below and in the complaint already filed by the Securities and Exchange Commission in the SEC Action.

2.      Plaintiffs bring this action on behalf of themselves and a proposed class of nationwide class of investors in EquiAlt and its associated real estate investment funds—Fund 1, Fund 2, Fund 3, and EA SIP Fund (together, the "Funds")—to recover funds misused, commingled, and stolen by EquiAlt, a Tampa-based real estate firm, along with its Chief Executive Officer, Davison, and its Managing Director, Rybicki (together, the "EquiAlt Principals") with the aid and assistance of (a) EquiAlt's Chief Investment Officer, Defendant Kelly; and (b) sales agents for EquiAlit: Defendants Family Tree, Wooten, LaDuca; Defendants American Investments, American Security, and Stevenson; and Defendants Joseph Financial and Armijo (together, the "Sales Agents").

3.      Plaintiffs are some of the largest individuals who invested in the EquiAlt Ponzi scheme and have agreed to bring these claims not only on behalf of themselves, but also on behalf of all similarly situated investors that were all promised that substantially all of their money would be used to purchase real estate in distressed markets in the United States and that their investments

would yield generous returns. Instead, EquiAlt, the EquiAlt Principals and various aiders and abettors, misappropriated millions of dollars in investor funds for their own personal use and benefit.

## FACTUAL BACKGROUND

4.      Investor money has been misused and misappropriated in many distinct ways, including: (a) money from one real estate investment Fund used to improperly purchase real estate for another Fund or for third-party entities owned by Davison; (b) money from one Fund used to pay back investors in another Fund; (c) substantial undisclosed commissions paid to unregistered sales agents; (d) substantial undisclosed fees such as due diligence fees, management fees, success fees, auction fees, underwriting fees, purchase discount fees, and bonuses paid to EquiAlt and Davison; and (e) substantial improper distributions of cash to the EquiAlt Principals. As a result of this misuse and misappropriation of investors' funds, Fund 1, Fund 2, and the EA SIP Fund are in a precarious financial condition. Indeed, although EquiAlt raised over $170 million to make real estate investments, it currently owns only approximately $55.3 million in real property.

5.      In addition to conducting a Ponzi scheme and misappropriating investor money, the EquiAlt Principals and Defendants made material misrepresentations and omissions to investors. Specifically, the EquiAlt Principals and Defendants falsely told investors that their investments, consisting of unregistered securities in the form of debentures issued by four real estate investment firms managed by EquiAlt, were "secure," "safe," "low risk," and "conservative." Although EquiAlt claimed that these debentures were exempt from registration with the Securities and Exchange Commission ("SEC"), in truth they were non-exempt. The sale of these unregistered securities by Defendants therefore violated both state and federal securities laws.

6.      EquiAlt and the EquiAlt Principals perpetrated this Ponzi scheme with the knowledge and specific assistance of Defendant Kelly, EquiAlt's Chief Investment Officer. Kelly was Davison's right-hand person in EquiAlt's Tampa office and handles much of the day-to-day events and actions. Kelly was knowledgeable about EquiAlt's fraudulent scheme and aided and abetted the fraudulent acts of the EquiAlt Principals, including the sale of EquiAlt's unregistered securities.

7.      The EquiAlt Principals also paid significant sales commission to numerous unregistered sales agents, including the Defendant Sales Agents. These Sales Agents sold investments to unaccredited and unsophisticated investors in various states. These Sales Agents aided and abetted EquiAlt in its violations of state and federal securities laws and violated common law duties to their customers.

8.      As a consequence of their active involvement in the EquiAlt Ponzi scheme, Defendants are liable for damages to all individuals, like Plaintiffs, who purchased EquiAlt's unregistered securities through the Defendants. Plaintiffs seek to represent a nationwide class of individuals damaged by the Defendants' conduct, as well as subclasses of individuals from Arizona and California.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA") codified as 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs.

10.      This Court has personal jurisdiction over each Defendant because each Defendant was involved in the marketing and sale of EquiAlt's unregistered securities. EquiAlt's unregistered securities originated from EquiAlt, which is located in Tampa, Florida. As such, all Defendants

have purposefully availed themselves of the laws of the State of Florida and have established minimum contacts with the State of Florida.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. In addition, Defendants EquiAlt, the Funds, the EquiAlt Principals, and Kelly are residents of this district and operated out of the EquiAlt office in Tampa, Florida.

## PARTIES

12.     Plaintiff Steven J. and Tracey F. Rubinstein are individuals and spouses who now, and at all times mentioned herein, resides in the State of Arizona. Steven Rubinstein is a retired physical education instructor and senior citizen who was seeking a safe source of retirement income when he and his wife, Tracey, invested in EquiAlt.

13.     Plaintiff Cary Toone is an individual who now, and at all times mentioned herein, resides in the State of Arizona. Toone invested in EquiAlt for the benefit of the Toone IRA.

14.     Plaintiff Ronald Webb is an individual who now, and at all times mentioned herein, resides in the State of Arizona. Webb invested in EquiAlt.

15.     Plaintiff Judith Tuggle is an individual who now, and at all times mentioned herein, resides in the State of Arizona. Tuggle invested in EquiAlt.

16.     Plaintiff Georgia F. Murphy is an individual who now, and at all times mentioned herein, resides in the State of California. Murphy invested in EquiAlt.

17.     Plaintiff Harold Hammon is an individual who now, and at all times mentioned herein, resides in the State of Arizona. Hammon invested in EquiAlt individually and for the benefit of the Hammon IRA.

18.     Defendant EquiAlt is an Arizona limited liability company with its principal place of business in Tampa, Florida.

19.     Defendant Fund 1 is a Nevada limited liability company with its principal place of business in Tampa, Florida.

20.     Defendant Fund 2 is a Nevada limited liability company with its principal place of business in Tampa, Florida.

21.     Defendant Fund 3 is a Nevada limited liability company with its principal place of business in Tampa, Florida.

22.     Defendant EA SIP Fund is a Nevada limited liability company with its principal place of business in Tampa, Florida.

23.     Defendant Davison is an individual who now, and at all times mentioned herein, resides in the State of Florida. Davison was the EquiAlt's Chief Executive Officer and orchestrated the Ponzi Scheme with Defendant Rybicki.

24.     Defendant Rybicki is an individual who now, and at all times mentioned herein, resides in the State of Florida. Rybicki was EquiAlt's Managing Director and orchestrated the Ponzi scheme with Defendant Davison.

25.     Defendant Kelly is an individual who now, and at all times mentioned herein, resides in the State of Florida. Kelly was the Chief Investment Officer for EquiAlt and worked out of EquiAlt's Tampa office as Davison's right-hand man. Kelly was intimately aware of and knowingly aided and abetted the Ponzi scheme perpetrated by EquiAlt and the EquiAlt Principals.

26.     Defendant Family Tree is an Arizona limited liability company with a principal place of business in Scottsdale, Arizona.

27.     Defendant Wooten is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that State. Defendant Wooten is the Principal of Family Tree.

28.     Defendant LaDuca is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that State. Defendant LaDuca is a certified estate planning consultant for Family Tree and sold EquiAlt's unregistered securities to persons that include the Rubinstein Plaintiffs.

29.     Family Tree, Wooten, and LaDuca operated as a sales agent of EquiAlt, distributing sales materials to solicit investment in EquiAlt. Family Tree, Wooten, and LaDuca processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their investments, including the reinvestment of funds. Family Tree, Wooten, and LaDuca were paid for their solicitation efforts.

30.     Defendant American Security is an Arizona limited liability company with a principal place of business in Prescott, Arizona.

31.     Defendant American Investments is an Arizona limited liability company with a principal place of business in Prescott, Arizona.

32.     Defendant Stevenson is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that State. Steven is the owner of American Security and American Investments.

33.     Defendant Stevenson and his companies, American Security and American Investments, operated as a sales agent of EquiAlt, distributing sales materials to solicit investment in EquiAlt. American Security, American Investments, and Stevenson processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their

investments, including the reinvestment of funds. American Security, American Investments, and Stevenson were paid about $1.5 million for their solicitation efforts.

34.     Defendant Joseph Financial is a California limited liability company with its principal place of business in San Diego, California.

35.     Defendant Armijo is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that State. Armijo is the sole owner of Joseph Financial.

36.     Armijo and his company, Joseph Financial, operated as a sales agent of EquiAlt, distributing sales materials to solicit investment in EquiAlt. Joseph Financial and Armijo processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their investments, including the reinvestment of funds. Joseph Financial and Armijo were paid for their solicitation efforts.

## GENERAL FACTUAL ALLEGATIONS

### A. EquiAlt and its Offerings

37.     The EquiAlt Principals controlled EquiAlt, whose primary business was to directly, or indirectly, manage all of the day-to-day operations of the Funds including the solicitation of investors, and all of the Funds' accounting and financial activities. Davison formed EquiAlt in 2011 and has signature authority over the company's bank accounts. Rybicki managed EquiAlt's relationship with various unlicensed sales agents (acting as unregistered broker-dealers), including the Defendants, who sold the Funds' securities, communicated with investors, and was otherwise involved in raising money for the Fund.

38.     In marketing materials and through its website, EquiAlt claims to own a portfolio of revenue-generating condominiums and single and multi-family homes. EquiAlt also attracted

investors using private placement memorandums, or "PPMs". Exemplars of these PPMs are attached as **Exhibit A.**  Meanwhile the PPMs for the Funds state that the investment objective of the Funds is to purchase and sell single-family properties in distressed real estate markets in the U.S. and participate in opportunistic lending in the U.S. In marketing materials provided to prospective investors, EquiAlt boasts that its programs or offerings "protect against market conditions" and are "not susceptible to interest rate hikes & lending trends." EquiAlt also claims to provide commercial lending investments to construction and development projects, "filling in the gaps left by local community banking systems."

39.     From January 2010 to November 2019, EquiAlt raised more than $170 Million from some 1,100 investors though the sale of fixed rate debentures issued by the Funds (the "EquiAlt Debentures"). Of that total amount, $145 Million was raised from January 2015 through November 2019. These debentures are securities within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. EquiAlt continues to market and raise funds from investors.

40.     Defendants sold investors one type of security: 3-year or 4 year term debentures of the Funds providing a fixed annual return of 8 % to 10%. These EquiAlt Debentures were never traded on any national exchange and are not otherwise "covered securities" under 15 U.S.C. § 78bb(f)(5)(E). Upon information and belief, the offering materials for the EquiAlt Debentures were prepared by the law firm of DLA Piper.  In fact, DLA Piper previously touted to the public all about their involvement and major role in assisting many facets of work for EquiAlt, but has since removed these specific website announcements:

> DLA Piper advises EquiAlt on the formation and offering of its
> ...www.dlapiper.com › news › 2018/11 › dla-piper-advises-equialt-on-q...
> Nov 15, 2018 - DLA Piper represented EquiAlt LLC, in the formation and offering
> of their recently formed EquiAlt Qualified Opportunity Zone Fund, LP that ...

> Paul Wassgren | People | DLA Piper Global Law Firmwww.dlapiper.com › people › wassgren-paul
> DLA Piper represented EquiAlt LLC, in the formation and offering of their recently formed EquiAlt Qualified Opportunity Zone Fund, LP that purchases and ...
>
> https://www.leopardsolutions.com/hotspot/ListSummaryDetails.aspx?categoryid=0&month=11&year=2018
> DLA Piper advises EquiAlt on the formation and offering of its US$500 million Qualified Opportunity Zone fund
>
> DLA Piper - @DLA_Piper Twitter Profile | Twipuwww.twipu.com › DLA_piper
> Explore @DLA_Piper Twitter Profile | DLA Piper, a global law firm operating through ... We advised EquiAlt on the formation and offering of its US$500 million ...

Additionally, in a brochure created by EquiAlt concerning "Alternative Investment Strategies," DLA Piper LLP (US) is listed as the "Legal" service provider. *See* SEC Action, ECF No. 7-6 at 49.

41.     Many of the investors were elderly, retired and used IRAs to fund their investments in the Funds. Furthermore, many of the investors were unaccredited or unsophisticated in that they lacked knowledge and expertise in financial or business matters, were not capable of evaluating the merits and risks of the investment, and were not otherwise capable of bearing the economic risks of the investment. Many of the investors were attracted by representations that the investments in the Funds were "secure," "safe," "low risk," and "conservative" and by assurances that EquiAlt could not go bankrupt.

42.     EquiAlt also used in-house employees and unlicensed external sales agents such as the Defendant Sales Agents to solicit investments from the general public through cold calling campaigns, social media, websites, and in-person meetings. Although the PPM provided to many investors stated that the Funds "may" pay commissions or fees to registered broker/dealers or other financial intermediaries, the Funds always paid commissions of anywhere between 10%–14%.

This is another place where the PPMs were false and misleading. In fact, over a period of several years the Funds have paid commissions (primarily to Rybicki or his company BR Support Services, LLC) totaling approximately $24 million using investor money. Moreover, many of the subscription agreements signed by Rybicki actually stated that the investments are being sold without commission.

## B. Fraudulent Conduct

### i. EquiAlt is Conducting a Ponzi Scheme

43.     The Funds have been operated as Ponzi scheme almost since their inception by paying investors their monthly interest payment for the unregistered securities by raising and using new investor funds to pay old investors. While Fund 3 is now closed, Fund 1, Fund 2, and the EA SIP Fund have collectively been raising from investors approximately $2–$3 million per month since January 2018.

44.     Notably, since the beginning of their operations, the Funds have suffered significant financial losses with monthly costs and expenses, including the interest owed to investors, greatly exceeding revenues generated from the Funds' business operations.

45.     Even if Fund 1, Fund 2, and the EA SIP were able to liquidate their real estate holdings at their values stated in their internal books and records, the Funds' combined assets would fall millions of dollars short of the amount owed to investors by December 2020.

46.     The EquiAlt Principals and Kelly knew that they were running a Ponzi scheme. For example, Kelly prepared one or more "point in time" spreadsheets for Davison. These spreadsheets reflected the numbers for the properties at a particular point in time. On one spreadsheet, for example, Kelly's report showed the EquiAlt properties' portfolio value, notes held and cash out numbers. *See* SEC Action, ECF No. 7–1 at 161–64 (Exhibit 3 to the SEC's deposition of Davison).

It also held the rent roll, being the amount of rent coming in on any given month. *Id.* That spreadsheet showed almost $360,000 in total monthly revenue, and at that time, there was $104 million raised from investors. *Id.* Thus, at that point in time, the annual revenue was about $4,320,000 against $104 million of investor funds, meaning a gross return of just 4.1%, while investors were promised 8%, net of operating revenues and commissions. Thus, at that point in time, Kelly and Davidson knew that there was not enough income to pay investors, meaning the only way they could pay investors was by raising new money from new investors. Kelly thus had actual knowledge of the Ponzi scheme based on the reports he personally prepared just by reviewing the revenues and the amounts owed to investors.

47.     The fact that EquiAlt was operated as a Ponzi scheme was gradually revealed by EquiAlt's dealing with professionals. For example, upon information and belief, Wells Fargo Bank had been performing banking functions EquiAlt for several years when, at some point, it sought a meeting with Davison to discuss EquiAlt's accounts. Instead of conducting that meeting, Davison abruptly transferred all of EquiAlt's business to Bank of America.

48.     Similarly, for many years, EquiAlt's accounting was performed by an outside accounting firm, Gino Mauriello & Co ("Gino"). At some point, Davison announced that all accounting was going to be performed in-house and an accountant from Gino came in to train a bookkeeper, Michelle Rodriguez, who lacked the requisite education and experience to perform proper financial controls. By early 2017, the workload was too much for Rodriguez and all association with Gino ended. Davison thereafter hired the Taylor White accounting firm to perform a search for a new in house accountant. This search led to the hiring of Denver Stoddart as EquiAlt's CPA, who remained a contract worker for Taylor White. Later still, EquiAlt expanded

its in house accounting group by hiring Bud Williams from Taylor White as well as three other short-term people.

49.     Plaintiffs will conduct discovery regarding the banks and accounting firms involved in EquiAlt to understand their full extent and involvement in these activities.

**ii. Misappropriation of Investor Funds**

50.     The EquiAlt Principals have misappropriated millions of dollars from the Funds for their own personal benefit. In fact, between 2017 and 2018 Davison and Rybicki received improper cash distributions totaling more than $11 million from the Funds. And in 2019, Davison and Rybicki took improper cash distributions from the Funds of $6.1 million and $1.2 million, respectively, purportedly for the repayment of loans to the Funds. Kelly also received improper "commissions" while working at EquiAlt.

51.     The EquiAlt Principals often used this money to purchase high-end personal items such as luxury automobiles (such as Ferraris, Porsches and a Rolls Royce), watches, and to charter private jets. Davison alone spent more than $2.7 million on luxury automobiles and watches and chartering private jets. Davison, in April 2017, also took cash distributions from several of the Funds totaling $1.8 million and used the money to pay personal back income taxes owed to the Internal Revenue Service.

52.     In addition to these improper cash distributions, when visiting New York, Davison stayed on multiple occasions at one of the Funds' most expensive properties, a $2.7 million Manhattan condominium which has never generated any income for the Funds, despite having been purchased several years ago with investor money.

### iii. Misuse of Investor Funds

53.     Instead of investing their funds as promised, the Defendants have misused millions of dollars in several distinct ways – all of which are inconsistent with the PPMs provided to investors.

54.     More specifically, the PPM for Fund 1, Fund 2, and the EA SIP Fund state that investor money would be used to purchase, own, improve and/or sell real property. In fact, the PPM for each of these Funds included a detailed chart of "projected sources and uses of cash." The chart, however, identified only the following six specific uses of that cash: investments in property, accounting and tax preparation, legal costs, investor relations and communications expenses, marketing and sponsorship event fees, and miscellaneous expenses and reserves. While the PPM for these Funds state that "All uses of proceeds are estimated and subject to change," only the above six specific uses of investor proceeds are delineated in the document.

55.     Despite the restrictions of use contained in the PPMs, the Defendants misused investor funds in several ways, including (a) money from one Fund being used to purchase real estate for another Fund or for third party entities owned by Davison; (b) money from one Fund being used to pay investors in another Fund; (c) substantial undisclosed commissions paid to unregistered sales agents, including Defendants; (d) substantial undisclosed fees such as due diligence fees, management fees, success fees, auction fees, underwriting fees, purchase discount fees, and bonuses paid to EquiAlt and Davison; and (e) substantial improper cash distributions to Davison and Rybicki. The misuse of investor funds was not an isolated event but rather was continuous over a period of several years and totaled millions of dollars.

56.     For example, sometimes contractors would be asked to prepare invoices for extra work on a real estate property owned by EquiAlt that was not actually performed. These invoices

were used to paper over the fraud. In another instance, two insiders at EquiAlt were terminated after reporting to Davison that they were seeing strange things, such as the sale of real estate property by one Fund and then repurchase of that same real estate property by another Fund at a higher price.

### C.  Misrepresentations and Omissions to Investors

57.    EquiAlt, the EquiAlt Control Persons, and the Defendants have misrepresented to investors how their money would be used by the Funds. For example, the PPMs for Fund 1, Fund 2, and the EA SIP Fund indicate that approximately 90% of investor funds would be used to "invest in property." Yet, less than 50% of investor funds were actually used for that purpose. Indeed, a substantial part of the remaining funds was used for improper purposes such as the payment of millions of dollars in fees and bonuses to EquiAlt and others. None of these other fees were described in the offering documents or marketing materials sent to investors.

58.    As alleged above, PPMs for Fund 1, Fund 2, and the EA SIP Fund disclosed a list of specific uses of investor funds. This list, however, did not disclose that the Funds would use investor money to pay EquiAlt extraneous fees described above totaling millions of dollars. For example, although not disclosed to investors, the Funds paid EquiAlt a so-called "discount fee" or the difference in the listed sales price for a particular property and the ultimate purchase priced paid by the Fund to acquire such property. Instead of benefiting from a lower ultimate sales price for the property, the Funds paid the actual cost savings to EquiAlt as a discount fee. No aspect of this fee was ever disclosed to investors who were already paying substantial management and other fees to EquiAlt supposedly to manage the Funds.

59.    The Defendants also failed to disclose to investors that more than $6.61 million of investor money would be transferred between the Funds with the money raised by one Fund being

used to pay the debts and obligations of another Fund. For example, in December 2015, Fund 1 and Fund 2 transferred, respectively $1.29 million and $1.08 million to Fund 3, which Fund 3 used to pay approximately $2.3 million in principal and interest to its investors. Fund 3 could not have made these payments without the cash infusion from Funds 1 and 2.

60.     The Defendants also failed to adequately disclose to investors that their funds would be used to pay commissions to unlicensed third party sales agents. First, many of the subscription agreements signed by Rybicki stated that investments in the Funds were being sold without the payment of a commission. Furthermore, while the PPMs provided to investors stated that the Funds "may" pay commissions to sales agents, in reality commissions were *always* paid in connection with the sale of the Funds' investments. In addition, in many cases investors never received the PPM and were not informed about any commission being paid in connection with their investment.

61.     According to the SEC, Ronald Stevenson and his company raised about $15,180,000 from many investors, and was paid $1.5 million in commissions by EquiAlt. This means that EquiAlt was paying approximately 10% in commissions to sell EquiAlt investments, much higher than industry averages for the sale of investments and a red flag for any investment advisor.

62.     Investors were also misled about the payment of management fees to EquiAlt. Although EquiAlt collected substantial management fees from the Funds, many investors were expressly told that no management fees would be paid to EquiAlt. For example, EquiAlt's President of Business Development and Marketing stated to Fund 2 investors in writing that EquiAlt had no management fees.

63.     Moreover, although the PPMs for all the Funds state that "the Manager will receive Management Fees as set forth in the Operating Agreement and as described more fully below," there is no description elsewhere in the PPMs (or in the Operating Agreements, which were not sent to investors) of what or how the management fees would be paid. Nowhere in the offering materials is there any disclosure to investors that EquiAlt and Davison would receive more than $6.67 million in "management fees" from the Funds or of the millions of dollars in other fees described above.

**ii.     False Statements About Risk**

64.     Investors were misled about the safety and risk of their investments. While pitching investments in the Funds, the Defendants represented that the investments were "low risk," "safe, and "conservative." Investors were even told that the Funds had "never lost investor dollars since inception." The investments, however, were anything but low risk, safe or conservative. In fact, the Funds have suffered substantial financial losses since their inception. Furthermore, Davison and Rybicki have depleted the Funds' assets through a years-long scheme involving outright misappropriation and misuse of investor funds.

**iii.     False Statements About Registration with the Commission and Compliance with Applicable Laws**

65.     EquiAlt falsely told investors in at least one Fund (Fund 2) it was registered with the Commission since 2009. In truth, neither EquiAlt nor the Funds have ever been registered with the Commission in any capacity.

66.     Written sales materials provided to investors also stated that "payments to licensed brokers and/or finders may be made in compliance with applicable federal and state securities laws." In reality, during a period of several years the Funds and BR Support Services, LLC paid

commissions totaling millions of dollars to unlicensed sales agents deployed by EquiAlt to market and promote the Funds' investments, including payments to the Defendants.

### iv.     False Statements About Fund Management

67.     Investors were even misled about the persons involved in managing the Funds. At least two different versions of the PPM for Fund 1 and Fund 2 identified an individual referred to herein as "DD" as a CPA with an MBA degree who was serving as EquiAlt's Chief Financial Officer. The description of DD's professional background highlighted DD's prior experience at a Big-Four accounting firm, with SEC reporting requirements, as a CFO of a $100 million real estate mortgage and title company, and as an author. However, DD has never worked as EquiAlt's CFO.

### D.  The EquiAlt Debentures Were Required to Be Registered

68.     The EquiAlt debentures constitute "securities" that cannot be offered or sold without registration under federal and state blue sky laws.

69.     Arizona Revised Statues § 44-1841 prohibits the offer for sale or sale within or from Arizona of any securities unless the securities have been registered pursuant Arizona statute, or are federal covered securities. Arizona Revised Statutes § 44-2001 affords a statutory cause of action to victimized investors for violations of Section 44-1841. Finally, Arizona Revised Statutes 44-2003 provides that an action brought under section 44-2001 may be brought against any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale or purchase, and such persons shall be jointly and severally liable to the person who is entitled to maintain such action, provided that no person shall be deemed to have participated in any sale or purchase solely by reason of having acted in the ordinary course of that person's professional capacity in connection with that sale or purchase.

70.     California Corp. Code § 25110 prohibits the offer or sale by any person in California of securities that are not qualified through registration. California Corp. Code § 25503 affords a statutory cause of action to victimized investors for violations of Section 25110. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25110 with an intent to deceive or defraud is jointly and severally liable with any other person liable under Section 25503.

71.     The EquiAlt Debentures were not properly registered or qualified for offer or sale either with any federal or state regulator. The EquiAlt Debentures were unlawfully offered for sale and sold as unregistered securities under federal and state blue sky laws.

72.     The EquiAlt Debentures state that they are securities which are exempt from registration. According the Form Ds EquiAlt and/or the Funds filed with the SEC, the EquiAlt Debentures were claimed to be exempt from registration pursuant to Rule 506(b) of Regulation D, which is considered a "safe harbor" under Section 4(a)(2) of the Securities Act.

73.     First, the EquiAlt Debentures were not exempt from registration under Rule 506(b) because, upon information and belief, they were sold to more than 35 non-accredited investors.

74.     Second, the EquiAlt Debentures were not exempt from registration under Rule 506(b) because they were marketed to the public through general solicitations and advertising and sold to non-accredited investors. An exemplar of EquiAlt's general solicitation and advertising is attached as **Exhibit B.**

75.     Third, EquiAlt and the Funds failed to disclose in their Form D their compensation arrangements and personal use of funds, as described above. These failures to disclose constitute additional violations of Rule 506(b) of Regulation D.

**E.  Plaintiffs' Individual Experiences**

**i.  The Rubinstein Plaintiffs**

76.     The Rubinstein Plaintiffs were introduced to EquiAlt by the Family Tree Defendants, who advised that investing in their debentures was a safe way to earn a high rate of return on their money with minimal risk. Specifically, Defendant LaDuca introduced the Rubinstein Plaintiffs to EquiAlt and told them that they had done their due diligence and it was a good investment. Indeed, LaDuca stated he was so confident in the investment that the principal of Family Tree, Wooten, had his mother invest in EquiAlt.

77.     On January 31, 2020, the Rubinstein Plaintiffs purchased a $75,000 investment with Fund 2, at an annual rate of 8.00%, with a 48-month term. Payments were to be made monthly beginning in March 2020. A copy of the Rubinstein Investment Documents are attached as **Exhibit C.** These documents are signed by both Steven J. Rubinstein and Tracey F. Rubinstein, on behalf of the Trust, and Barry M. Rybicki, on behalf of Fund 2.

78.     The Form of Debenture prominently states:

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE, AND IS ISSUED IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR RE-SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS.

*Id.*

79.     The Rubinstein Plaintiffs were also required to fill out a Prospective Purchaser Questionnaire. *Id.* The Rubinstein Plaintiffs disclosed that they were not an "Accredited Investor,"

but that they have a net worth of approximately $2 million and approximately $150,000 of income in 2019, with a reasonable expectation of earning an annual income of approximately $150,000 the following year.

80. The Rubinstein Plaintiffs also executed a Subscription Agreement with EquiAlt. *Id.* The Subscription Agreement provided the Rubinstein Plaintiffs with 7500 units of Class A Membership interest in Fund 2 at a cost of $10 per unit.

**ii.    Toone**

81. Plaintiff Toone was introduced to EquiAlt by Family Tree, Wooten, and LaDuca, who advised that investing in their debentures was a safe way to earn a high rate of return on their money with minimal risk.

82. On April 9, 2019, Plaintiff Toone purchased a $60,000 investment with Fund 1, at an annual rate of 8.00%, with a 48-month term. Payments were to be made monthly beginning in May 2019. Additionally, on April 26, 2019, Toone purchased a $30,000 investment with Fund 2, at an annual rate of 8.00%, with a 48 month term. A copy of the Toone Investment Documents are attached as **Exhibit D.** These documents are signed by both Toone and Rybicki, on behalf of Fund 1.

83. Each of Toone's Forms of Debenture prominently state:

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE, AND IS ISSUED IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR RE-SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS.

*Id.*

84.     Toone was also required to fill out a Prospective Purchaser Questionnaire with respect to each purchase. *Id.* Regarding the first purchase, Plaintiffs disclosed that he was not an "Accredited Investor," but that he has a net worth of approximately $400,000 and approximately $65,000 of income in 2018, with a reasonable expectation of earning an annual income of approximately $65,000 the following year. Regarding the second purchase, Plaintiffs disclosed that he was not an "Accredited Investor," but that he has a net worth of approximately $500,000 and that he had a reasonable expectation of earning an annual income of approximately $50,000 in 2019.

85.     Toone also executed two Subscription Agreements with EquiAlt. *Id.* The first Subscription Agreement provided Toone with 6000 units of Class A Membership interest in Fund 1 at a cost of $10 per unit. The second Subscription Agreement provided Toone with 3000 units of Class A Membership interest in Fund 1 at a cost of $10 per unit.

**iii.    Webb**

86.     Webb was introduced to EquiAlt by Stevenson, who advised that investing in EquiAlt's debentures was a safe way to earn a high rate of return on his money with minimal risk.

87.     Over the course of several years, Stevenson, American Security and American Investments persuaded Webb to make a series of investments in EquiAlt, through Webb's IRA and individually. Webb purchased a $239,600 EquiAlt Debenture for the benefit of the Webb IRA on September 8, 2017 through Fund 1. Webb made purchased an additional $250,000 EquiAlt Debenture for the Webb IRA on May 18, 2018. Webb purchased also made the following purchases of EquiAlt Debentures on an individual basis: a $100,000 purchase on January 19, 2016; a $100,000 purchase on April 30, 2018; a $100,000 purchase on July 11, 2018; and a $100,000 purchase on August 15, 2018.

88.     Armijo and his company, Joseph Financial, operated as a sales agent of EquiAlt, distributing sales materials to solicit investment in EquiAlt. Joseph Financial and Armijo processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their investments, including the reinvestment of funds. Joseph Financial and Armijo were paid for their solicitation efforts.

### iv.    Tuggle

89.     Tuggle was also introduced to EquiAlt by Stevenson, who advised that investing in EquiAlt's Debentures was a safe way to earn a high rate of return on his money with minimal risk.

90.     Tuggle purchased three EquiAlt Debentures. Tuggle purchased a $25,000 EquiAlt Debenture on June 19, 2017, in Fund 2; purchased a $20,000 EquiAlt Debenture on April 3, 2018, in EA SIP Fund; and purchased a $25,000 EquiAlt Debenture on April 30, 2018, in Fund 1.

### v.    Murphy

91.     Plaintiff Murphy was introduced to EquiAlt by Armijo, who advised that investing in its debentures was a safe way to earn a high rate of return on her money with minimal risk.

92.     On December 1, 2016, Plaintiff Murphy purchased a $250,000 investment with Fund 1, at an annual rate of 10.00%, with a 36-month term. Payments were to be made monthly beginning January 1, 2017. A copy of the Murphy Investment Documents is attached as **Exhibit E.** These documents are signed by both Murphy and Rybicki, on behalf of Fund 1.

93.     Murphy's Form of Debenture prominently states:

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE, AND IS ISSUED IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR RE-SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM OR IN A

TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS.

*Id.*

94.     Murphy was also required to fill out a Prospective Purchaser Questionnaire. *Id.* Murphy certified that she was an accredit investor because she is an individual whose individual net worth, or joint net worth with her spouse, presently exceeded $1,000,000.

95.     Murphy also executed a Subscription Agreement with EquiAlt. *Id.* The Subscription Agreement provided Murphy with 25,000 units of Class A Membership interest in Fund 1 at a cost of $10 per unit.

96.     On January 30, 2018, Murphy liquidated $100,000 of her initial $250,000 investment and executed a transfer of funds, authorizing transfer of her investment in the amount of $150,000 from Fund 1 to EA SIP Fund.

97.     On December 1, 2019, Murphy's investment came up for renewal. Armijo emailed Murphy on December 11, 2019 asking her if she would like him to process the renewal paperwork. In response, Murphy indicated that she would like to take her funds back in full.

98.     On January 8, 2020, EquiAlt sent Murphy a letter regarding "Wind down of EquiAlt Fund LLC," in which it stated that EquiAlt would be closing Fund 1 and to "begin the shift of activities to facilitating the sale of the fund's assets to repay all investor principle starting in Q1 2020." *See* **Exhibit F**. The letter contained many misrepresentations about Fund 1, including:

   a.   "We are pleased that the Funds has been successful and has achieved its goals."

   b.   "Management estimates that the Fund is solvent as a stand-alone entities" and "the value of the assets exceeds the liabilities against the fund."

*Id.* The letter concluded by explaining that Fund 1 would be wound down over a period of 18 months. As of the date of this complaint, Murphy has not been re-paid her $150,000 investment. *Id.*

### vi.   Hammon

99.   Hammon was introduced to EquiAlt and the EquiAlt Debentures by Wooten of Family Tree, who advised that investing in its debentures was a safe way to earn a high rate of return on her money with minimal risk. Wooten acted as the intermediary between EquiAlt and the Funds and Hammon.

100.   On October 24, 2017, Plaintiff Murphy purchased two EquiAlt Debentures: one for the Hammon IRA, and one individually.

101.   The first EquiAlt Debenture Hammon purchased for the Hammon IRA made a $655,101.78 investment with Fund 1, at an annual rate of 8.00%, with a 48-month term. Payments were to be made monthly beginning December 2017.

102.   The second EquiAlt Debenture Hammon purchased individually made a $300,000 investment with Fund 1, at an annual rate of 8.00%, with a 48-month term. Payments were to be made monthly beginning December 10, 2017. Wooten put Hammon under the impression that these funds would be placed into trust, however the documents were signed by Hammon individually and Hammon does not possess any documentation that the trust was actually created. Should these funds have been placed into a trust in his name, Hammon asserts these claims as trustee of that trust.

103.   Both of Hammon's Forms of Debenture prominently state:

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE, AND IS ISSUED IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF

1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR RE-SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS.

104.   Hammon was also required to fill out a Prospective Purchaser Questionnaire.

105.   Hammon also executed two Subscription Agreements with EquiAlt. The first Subscription Agreement provided Hammon with 30,000 units of Class A Membership interest in Fund 1 at a cost of $10 per unit. The second Subscription Agreement provided Hammon with 65,510 units of Class A Membership interest in Fund 1 at a cost of $10 per unit.

**F.  Application of the Discovery Rule and the Fraudulent Concealment Doctrine.**

106.   Defendants continued to actively solicit investors through false assurances of EquiAlt and the Funds' financial stability contained in a constant stream oral and written communications to investors and prospective investors from 2016 through January 2020. Because of the continuous positive assurances concerning the financial vitality of EquiAlt and the Funds, investors continued to pour money into EquiAlt even until a few weeks prior the SEC filed the SEC Action on February 11, 2020.

107.   The money continued to flow into early 2020 because the investors had no inkling of the securities violations, of the financial insolvency of the Funds, or of the Ponzi scheme they had become.  Nor did they have any reason to suspect wrongdoing by anyone had caused them injury, as opposed to general market conditions.

108.    Furthermore, Defendants owing the investors fiduciary duties of truthfulness and full disclosure continued to feed them assurances through a series of investor reports designed to prevent them from suspecting any wrongdoing.

109.    In January 2020, for example, EquiAlt sent the letter concerning the winding down of Fund 1, described above. *See* Ex. E. This letter falsely represented that Fund 1 was solvent and achieving its goals and that investors would be paid back when, in truth, the fund was insolvent. Upon information and belief, similar representations were made to investors from time to time to convince them to keep their money invested with EquiAlt.

110.    Plaintiffs and the Classes aver that, based on the false and misleading information fed to them, and the material information concealed from them by EquiAlt and Defendants, under Arizona's and/or California discovery rule they did not discover and did not have reason to discover their causes of action relating to the EquiAlt Ponzi Scheme until February 11, 2020, at the earliest.  Prior to that date, Plaintiffs and the other investors did not have a reasonable factual basis to suspect that they had been harmed through any breach of fiduciary duty, fraud, or violations of Arizona's or California's securities laws.

111.    Alternatively, under Arizona's and/or California's fraudulent concealment doctrine, the limitations period was likewise tolled at least through February 11, 2020, based on the active deceptive conduct of EquiAlt and Defendants in concealing the Plaintiffs' causes of action.

## TENDER

112.    Conditioned upon the receipt of the rescissionary relief afforded under the Arizona Securities Act and the California Securities Act, Plaintiffs tender their EquiAlt Debentures to Defendants.

## <u>CLASS ALLEGATIONS</u>

113.    Plaintiffs brings their claims on behalf of themselves and the following plaintiff Nationwide and state classes:

**The Nationwide Class**: All persons who purchased an EquiAlt Debenture issued by any of the EquiAlt Funds, whether new or by reinvestment, that have not been fully repaid their principal investment.

**The Arizona Class**: All persons residing in the State or Arizona who purchased an EquiAlt Debenture issued by any of the EquiAlt Funds, whether new or by reinvestment, that have not been fully repaid their principal investment.

**The California Class**: All persons residing in the State or California who purchased an EquiAlt debenture issued by any of the EquiAlt Funds, whether new or by reinvestment, that have not been fully repaid their principal investment.

(collectively, "the Classes"). Excluded from the Classes are Defendants and their officers, directors and employees.

114.     Certification of the Class is appropriate and warranted under Federal Rule of Civil Procedure 23.

115.     The members of the Class are so numerous that separate joinder of each member is impracticable, especially given the SEC has estimated over 1,100 persons have purchased EquiAlt's unregistered securities, many of them Arizona and California residents. Moreover, upon information and belief, the Sales Agents each sold EquiAlt's unregistered securities to, at minimum, dozens of individuals. Although the number of Class members and their names are presently unknown, this information can be readily determined from EquiAlt's records.

116.     Plaintiffs' contentions raise predominately questions of law or fact common to each member of the Class. These common legal and factual questions include, but are not limited to, the following:

(A)     whether the Defendants violated the Arizona Securities Act;

(B)     whether the Defendants violated the California Securities Act;

(C)     whether the EquiAlt Debentures were exempt from registration;

(D)     whether the Defendants are "statutory sellers" liable for the offer and sale of unregistered securities;

(E)     whether the Defendants are "control persons" of EquiAlt and/or the Funds;

(F)     whether the Defendants engaged in negligent misrepresentations concerning EquiAlt and the EquiAlt Debentures;

(G)     whether statements made by Defendants to investors in the PPMs misrepresented material facts about the business and operations of EquiAlt and the Funds;

(H)     whether Defendants breached their fiduciary duties to Plaintiffs and the Classes;

(I)     whether Defendants aided and abetted breaches of fiduciary duty;

(J)     whether Plaintiff and Class members are entitled to recessionary relief, damages or other forms of relief available under the Arizona Securities Act, and/or California Securities Act;

(K)     whether Plaintiff and Class members are entitled to other equitable relief.

117.    Plaintiffs' claims are typical of the claim of each member of the Class, because, *inter alia*, all Class members were injured through the misconduct alleged herein. Plaintiffs are advancing the same claim and legal theories on behalf of themselves and all members of the Class.

118.    Plaintiffs will fairly and adequately protect and represent the interests of each member of the Classes. Plaintiffs are willing and prepared to serve the Court and the Classes in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel

experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes.

119. The questions of law or fact common to the claim of each member of the Classes predominate over any question of law or fact affecting only individual members of the Classes.

120. Finally, class representation is superior to other available methods for the fair and efficient adjudication of the controversy. In particular,

(A) there is little economic incentive or other interest of Class members to individually prosecute separate claims,

(B) Plaintiffs are unaware of any other pending litigation to which any member of the Classes is a party and in which any question of law or fact controverted in the subject action is to be adjudicated,

(C) it is certainly desirable to concentrate this securities registration litigation in EquiAlt's home forum, where a receiver has been appointed, and

(D) there appear no difficulties likely to be encountered in the management of the claim or defense on behalf of the Class.

Judicial determination of the common legal and factual issues essential to this case would thus be far more efficient and economical as a class action than in piecemeal individual determinations.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Arizona Statutory Securities Fraud
### Against All Defendants

121. Plaintiffs refer to Paragraphs 1 through 112 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

122. The investments EquiAlt sold to Plaintiffs are securities under A.R.S § 1801(26).

123.    In connection with the offer and sale of the securities, EquiAlt, the EquiAlt Principals, and Kelly directly or indirectly engaged in the following acts:

a.  Employed a devise, scheme or artifice to defraud, in violation of A.R.S. § 44-1991(A)(1);

b.  Made untrue statements of material fact, and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of A.R.S. § 44-1991(A)(2);

c.  Engaged in transactions, practices, and courses of business, which operate as a fraud or deceit, in violation of A.R.S. § 44-1991(A)(3).

124.    Pursuant to A.R.S. § 44-2001, the EquiAlt Debenture are voidable, and Plaintiffs are entitled to their principal and interest, together with taxable court costs, and reasonable attorneys' fees.

125.    Davison, Rybicki, and Kelly are liable as control persons of EquiAlt and/or the Funds pursuant to A.R.S. § 44-1999.

126.    Kelly and Family Tree, Wooten, LaDuca, American Security, American Investments, and Stevenson knowingly or recklessly, directly or indirectly, made, participated in and/or induced separate and independent violations of A.R.S. § 44-1991(A). They are joint and severally liable as persons who offered and/or sold securities and/or aided and abetted and/or conspired with one another. They are liable for these violations of A.R.S. § 44-1991, pursuant to A.R.S. §§ 44-2001 and 44-2003(A).

127.    The securities fraud described herein damaged Plaintiffs and caused their losses.

128.    As a consequence of their violations of Arizona securities law, EquiAlt, the Funds, the EquiAlt Principals, Kelly, and the Sales Agents are joint and severally liable for rescissionary

damages and interest at the legal rate, pursuant to A.R.S. § 44-2001(A); attorneys' fees, pursuant to A.R.S. § 44-2001(A); and costs, pursuant to A.R.S. § 44-2001(A).

**SECOND CLAIM FOR RELIEF**
**California Statutory Securities Fraud**
**Against All Defendants**

129.    Plaintiffs refer to Paragraphs 1 through 112 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

130.    The investments EquiAlt sold to Plaintiffs are securities under Cal. Corp. Code § 25019.

131.    In connection with the offer and sale of the securities, EquiAlt, the Funds, the EquiAlt Principals, Kelly, and the Sales Agents directly or indirectly made untrue statements of material fact, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Cal. Corp. Code § 25401.

132.    Davison, Rybicki, and Kelly are joint and severally liable as control persons of EquiAlt and the Funds pursuant to Cal. Corp. Code. § 25504. At all material times, Davison, Rybicki, and Kelly had the legal authority to control the actions of EquiAlt, the Funds, and the employees.

133.    Defendants are also joint and severally liable under Cal. Corp. Code. § 25504.1 as they each materially aided in the acts constituting the securities fraud violations with the intent to deceive or defraud Plaintiffs.

134.    The securities fraud described herein damaged Plaintiffs and caused their losses.

135.    As a consequence of their violation of California securities law, Defendants are joint and severally liable for rescissionary damages and interest at the legal rate, pursuant to Cal. Cop. Code § 25501 and costs.

### THIRD CLAIM FOR RELIEF
### Sale of Unregistered Securities, A.R.S. § 44-1841
### Against All Defendants

136.    Plaintiffs refer to Paragraphs 1 through 112 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

137.    Defendants offered and/or sold securities in the form of the EquiAlt Debentures within or from the State of Arizona.

138.    The securities were neither registered nor exempt from registration. Accordingly, their offer and sale in Arizona was unlawful under A.R.S. § 44-1841.

139.    As a consequence of their sale of unregistered securities, Defendants are liable, jointly and severally, for rescissionary damages and interest at the legal rate, pursuant to A.R.S. § 44-2001(A); attorneys' fees, pursuant to A.R.S. § 44-2001(A); and costs, pursuant to A.R.S. § 44-2001(A).

### FOURTH CLAIM FOR RELIEF
### Sale of Unregistered Securities, Cal. Corp. Code § 25110
### Against All Defendants

140.    Plaintiffs refer to Paragraphs 1 through 112 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

141.    Defendants offered and/or sold securities in the form of the EquiAlt Debentures within or from the State of California.

142.    The securities were not registered or exempt from registration. Accordingly, their offer and sale in California was unlawful under California Corp. Code § 25110.

143.    As a consequence of their sale of unregistered securities, Defendants are liable, jointly and severally, for rescissionary damages and interest at the legal rate, pursuant to Cal. Corp. Code § 25503, and costs.

## FIFTH CLAIM FOR RELIEF
### Sale of Securities by Unregistered Salesmen, A.R.S. § 44-1482
### Against the Sales Agents

144.    Plaintiffs refer to Paragraphs 1 through 112 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

145.    The Sales Agents offered and/or sold securities in the form of the EquiAlt Debentures within or from Arizona.

146.    In connection with the offer and/or sale of the loan agreements, the Sales Agents acted as either "dealers or "salesmen" as defined by A.R.S. §44-1801.

147.    Upon information and belief, the Sales Agents were not registered in Arizona to offer or sell securities as required by A.R.S. § 44-1842.

148.    As consequence of their violations of A.R.S. § 44-1482, the Sales Agents are liable, jointly and severally, for rescissionary damages and interest at the legal rate, pursuant to A.R.S. § 44-2001(A); attorneys' fees, pursuant to A.R.S. § 44-2001(A); and costs, pursuant to A.R.S. § 44-2001(A).

## SIXTH CLAIM FOR RELIEF
### Sale of Securities by Unauthorized Broker-Dealers – Cal. Corp. Code § 25210(a)
### Against the Sales Agents

149.    Plaintiffs refer to Paragraphs 1 through 112 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

150.    The Sales Agents offered and/or sold securities in the form of the EquiAlt Debentures within or from California.

151.     In connection with the offer and/or sale of the loan agreements, the Sales Agents acted as "broker-dealers" as defined by Cal. Corp. Code § 25044.

152.     Upon information and belief, the Sales Agents were not registered in Arizona to offer or sell securities as required by Cal. Corp. Code § 25501.5(a)(1).

153.     As a consequence of their sale of unregistered securities, Defendants are liable, jointly and severally, for rescissionary damages and interest at the legal rate, pursuant to Cal. Corp. Code § 25503, and costs.

## SEVENTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### Against All Defendants

154.     Plaintiffs refer to Paragraphs 1 through 112 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

155.     Defendants acted as investment advisers, financial advisers and/or as licensed or unlicensed brokers in the sale of EquiAlt Debentures to the Plaintiffs and the Class.

156.     As investment advisers, financial advisers and/or as licensed or unlicensed brokers, the Defendants owe a common law fiduciary duty to the Plaintiffs and the Class as follows:

(a) the duty to recommend investments only after studying it sufficiently to become informed as to its nature, price, and financial prognosis;

(b) the duty to perform the customer's orders promptly in a manner best suited to serve the customer's interests;

(c) the duty to inform the customer of the risks involved in purchasing or selling a particular security;

(d) the duty to refrain from self-dealing;

(e) the duty not to misrepresent any material fact to the transaction; and

(f) the duty to transact business only after receiving approval from the customer.

157.   Defendants are vicariously liable for the acts of their officers who acted as their actual or apparent agents.

158.   The breaches of fiduciary duty caused damages to the Plaintiffs and the Class.

**EIGHTH CLAIM FOR RELIEF**
**Aiding and Abetting Breach of Fiduciary Duty**
**Against Kelly and Sales Agents**

159.   Plaintiffs refer to Paragraphs 1 through 112 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

160.   At all times relevant hereto, the EquiAlt Principals acted and failed to act as managers of EquiAlt.  In their capacity as the Company's managers, they owed certain fiduciary obligations to Plaintiffs and the Classes.

161.   The Managers owed Plaintiffs and the Classes the following fiduciary obligations under Cal. Civ. Code § 17153 and by its reference § 16404(a), and Arizona law (*In re Sky Harbor Hotel Props., LLC*, 443 P.3d 21 (Ariz. 2019)):

d.   the duty of undivided loyalty and the duty to refrain from engaging in unfair transactions with Members;

e.   the duty to fully disclose all material facts germane to the fiduciary relationship;

f.   the duty to refrain from acting on behalf of any party having an interest adverse to the Members interests; and/or

g.   the duty to act in the highest good faith to the Members and to refrain from obtaining or accepting any advantage over them in the Company's affairs by the slightest misrepresentation or concealment.

162.    Additionally, Plaintiffs and the Classes reposed trust and confidence in the EquiAlt Principals to handle their investments.  And in turn, the EquiAlt Principals accepted that trust and confidence, thereby creating a fiduciary relationship.

163.    The EquiAlt Principals breached their fiduciary obligations to Plaintiffs and the Classes and caused damages to Plaintiffs and the Classes in an amount to be proven at trial through their specific actions and inaction.

164.    Defendant Kelly aided and abetted, encouraged, and rendered substantial assistance to the EquiAlt Principals in breaching their fiduciary duties to Plaintiffs and the Classes. Defendant Kelly acted with complicity and knowledge of those breaches.

165.    The Sales Agents aided and abetted, encouraged, and rendered substantial assistance to the EquiAlt Principals in breaching their fiduciary duties to Plaintiffs and the Classes. The Sales Agents acted with complicity and knowledge of those breaches.

166.    Defendants each realized and intended that their conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein.

167.    As a result of the substantial assistance of Defendants, Plaintiffs and the Classes have suffered and continue to suffer monetary losses, all in an amount to be determined according to proof at trial.

168.    Defendants individual and collective acts and omissions were substantial contributing factors and causes of violations of the duties as set forth in this Count and to Plaintiffs' and the Classes' indivisible harm and damages, rendering Defendants jointly and severally liable to Plaintiffs and the Classes.

## NINTH CLAIM FOR RELIEF
### Negligent Misrepresentation
### Against All Defendants

169.    Plaintiffs refer to Paragraphs 1 through 112 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

170.    Defendants, in the course of their business, profession, and employment, and as part of transactions in which they had a pecuniary interest, misrepresented or omitted material facts in purporting to supply information to Plaintiffs for their guidance in purchasing the EquiAlt Debentures.

171.    Defendants intended that Plaintiffs rely on the information and provided it for that purpose.

172.    Defendants failed to exercise reasonable care or competence in obtaining and communicating the misrepresented and/or omitted facts to Plaintiffs.

173.    Plaintiffs justifiable relied upon Defendants' false misrepresentations and omissions in entering into the respective EquiAlt Debentures.

174.    As a direct and proximate result of Defendants' misrepresentations and omissions, and Plaintiffs' reliance thereon, Plaintiffs suffered direct and consequential losses, including the loss of their principal and interest under the EquiAlt Debentures.

175.    Defendants' conduct was aggravated and outrageous, guided by evil motives and with a willful and wanton disregard for Plaintiffs' interests, justifying an award of punitive damages.

176.    As a consequence of their negligent misrepresentations, Defendants are joint and severally liable for actual damages, in an amount to be proven at trial, punitive damages, the costs

of collection, litigation expenses, and recoverable costs, and pre- and post-judgment interest at the maximum prevailing statutory rate.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the Classes, pray for an order and judgment against Defendants and in their favor as follows:

A.      certifying the Classes as set forth in this Complaint, and appointing Plaintiffs as Class Representatives for these Classes;

B.      enjoining Defendants from further violations of their legal and fiduciary duties;

C.      awarding Plaintiffs and the Classes rescission;

D.      awarding Plaintiffs and the Classes restitution with interest at the legal rate;

E.      awarding Plaintiffs and the Classes monetary damages and interest at the legal rate;

F.      awarding Plaintiffs and the Classes the costs and disbursements of this action, including reasonable counsel fees, costs and expenses in amounts to be determined by the Court;

G.      awarding pre- and post-judgment interest; and

H.      granting such other and further relief as is just and proper.

## **REQUEST FOR JURY TRIAL**

Plaintiffs hereby request a trial by jury on all issues.


Respectfully submitted this 25th day of February, 2016.

By: *s/ Adam M. Moskowitz*
Adam M. Moskowitz, Esq.
Fla. Bar No. 984280
Adam@moskowitz-law.com
Adam A. Schwartzbaum
Fla. Bar No. 93014
Adams@moskowitz-law.com
**The Moskowitz Law Firm, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, Florida 33134
Telephone:  (305) 740-1423
Facsimile:  (786) 298-5737

Jeffrey R. Sonn, Esq.
Fla. Bar. No. 773514
jsonn@sonnlaw.com
**Sonn Law Group**
One Turnberry Place
19495 Biscayne Blvd. Suite 607
Aventura, FL 33180
Tel. 305-912-3000
Fax: 786-485-1501

Andrew S. Friedman, Esq.
(to be admitted *pro hac vice*)
afriedman@BFFB.com
Francis J. Balint, Jr., Esq.
(to be admitted *pro hac vice*)
fbalint@BFFB.com
bking@BFFB.com
**Bonnett Fairbourn Friedman & Balint, P.C.**
2325 E. Camelback Rd., Suite 300
Phoenix, AZ 85016
Telephone:  (602) 274-1100
Facsimile:  (602) 274-1199

*Attorneys for Plaintiff*