

**GOLDSTAR**
TRUST COMPANY

**FAIR MARKET VALUATION**
**DISCLOSURE STATEMENT**
(for Privately Offered Investments)

Box 719
Canyon, TX 79015
(800) 486-6888
Fax (806) 655-2490

**1** VALUATION AGENT'S INFORMATION

Name of Valuation Agent: _____    Title: _____

Firm Name: _____    Phone #: _____

Address: _____

Email Address: _____

I certify that I am qualified to give an independent valuation for the asset shown above, and that the value I will provide to GoldStar will be in full compliance with IRA Revenue Ruling 59-60. I also understand that the valuation provided will be used by GoldStar for reporting to the IRS and that any false or misleading valuation/appraisal of any assets may result in penalties and/or fines for both the valuator/appraiser and the account holder.

_____    _____
Signature of Valuation Agent                              Date

**2** VALUATION DISCLOSURE STATEMENT (from the Investment Sponsor)

As the Investment Sponsor, I understand that supporting documentation regarding the valuation of the asset is required annually. I understand and acknowledge that if this documentation is not provided, GoldStar reserves the right to distribute the asset(s) in-kind, causing a taxable event and closing the account after 30 days of the date of the notice.

_____    _____
Signature of Authorized Representative (Investment Sponsor)        Date

**GOLDSTAR IRA ACCOUNT OWNER**

If my investment sponsor fails to provide GoldStar with instruction on the disposition of the asset within the 30 days of the notice, I agree that I have been deemed to have instructed GoldStar to terminate my IRA. I understand and acknowledge that GoldStar will distribute the asset(s) in-kind, causing a taxable event and closing the account after 30 days of the date of notice. I also agree to pay for any fees or penalties pertaining to the termination of the account as well as re-registration of the asset(s) either to another financial institution or to myself in-kind. I further understand that the in-kind distribution of the asset can be avoided if the account is transferred to another IRA Custodian within 30 days of the date of the letter. GoldStar shall have no liability or responsibility to the accountholder or investment sponsor for any loss of value or expense suffered or incurred during termination of acting as custodian.

I certify that I am the owner of the referenced account and that the information contained herein is true and accurate to the best of my knowledge. I acknowledge the choice of valuation method and/or third party valuation services of the Investment Sponsor listed above to prepare, present and attest to the value of the asset listed above. I am aware that GoldStar does not have any involvement in the valuation of the above asset and does not endorse any third party valuation services in order to provide an annual valuation of assets.

**IMPORTANT: READ BEFORE SIGNING!**

Cary Toone
Printed Name

_Amy Toone_                    3/21/19
Signature of Account Holder        Date                  Account Number

**FOR INTERNAL USE ONLY**

Check: _____

Address: _____

Account #: _____

Contact Phone #: _____

Notes: _____



# GOLDSTAR
## TRUST COMPANY

# ACCOUNT
# REPRESENTATIVE FORM

This agreement should be completed only if you wish your financial advisor, broker, financial planner, or other person of your choice to be authorized as your Account Representative. The company or organization under which your designated Account Representative operates will be referred to herein as 'broker dealer'.

**Completion of this form will authorize GoldStar Trust Company ("GoldStar"), as custodian for your account, to do the following:**

- Provide your Account Representative with unlimited internet access to your account information
- Provide your Account Representative with an account statement, deposit confirmations and such other information as requested from time to time.

**I further acknowledge that:**

1. I understand that my Account Representative is my authorized agent and is not in any way an agent, employee, or representative of GoldStar.
2. I understand that my Account Representative may be a registered representative of a broker dealer organization, a financial advisor or other person that I deem acceptable.
3. I agree that it is my responsibility to authorize and initiate transactions for my account. GoldStar is instructed to make or receive payment for securities transactions, as indicated by Subscription Agreements, directions or instructions I have signed.
4. I agree that GoldStar is under no duty to investigate or inquire about any Subscription Agreements, directions, or instructions signed by me. I further agree that GoldStar will have no liability for any losses occurring because of changes in the market value of an asset or because GoldStar acted in reliance on instructions from me.
5. I understand that I may replace my Account Representative by giving written notice to GoldStar and that removing my Account Representative will not cancel any instructions given by the Account Representative before GoldStar received written notice that a new Account Representative has been designated.
6. I understand that if my Account Representative should leave the company or organization (also designated herein as my broker dealer), the broker dealer of record will remain on my account unless I change this designation by written notice to GoldStar.
7. I agree to indemnify and hold GoldStar harmless for any loss or breach of any kind because GoldStar acted in reliance on instructions from me, my Account Representative, his or her agent(s) or his or her broker dealer.

This agreement shall be interpreted and construed under the laws of the State of Texas, without regard to conflict of law principles. If a dispute arises out of or relates to this agreement, or the performance or breech thereof, the parties agree first to try in good faith to settle the dispute by mediation rules of the American Arbitration Association, before resorting to arbitration. Thereafter, any remaining unresolved controversy or claim arising out of or relating to this agreement, or the performance or breech thereof, shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Any mediation or arbitration shall be conducted in Canyon, Texas. The sole arbitrator shall be a retired or former judge of the Randall or Potter County District Courts. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

I attest by my signature below, that I understand and agree to the terms of this Account Representative Form and that I choose the person listed below as the Account Representative on my GoldStar account.

**Account Representative:**

Account Representative Name: __Cal Babbini_____   Salesman or Rep. # _____

Broker Dealer (company) Name: __EquiAlt Fund, LLC_____

Phone #: _____   Email Address: _____

Account Holder Signature: _Cary Toone_____   Date _3/31/19_____

Printed Name: _Cary Toone_____   Account # or SSN # _____

GTC Rev 2013/02

## GOLDSTAR TRUST COMPANY

### SELF-DIRECTED IRA FEE PAYMENT FORM

P. O. Box 719
Canyon, TX 79015
(800) 486-6888
Fax (806) 655-2490
NewBusiness@goldstartrust.com

Name on Retirement Account (First/MI/Last): _Cary Toone_

**\*All fees ($90) must be paid before assets can be purchased.**

### FEE PAYMENT OPTIONS (select one)

- ☑ Expedite process by paying with a credit/debit card:  Enter information below.  *RECOMMENDED*
- ☐ Call GoldStar Trust to pay with a credit/debit card:  1-800-486-6888
- ☐ Mail check to GoldStar Trust:  P.O. Box 719, Canyon, TX  79015

---

- ☑ **Pay All First Year Fees - $90 -** ($25 Establishment Fee + $65 Maintenance Fee).  *RECOMMENDED*
- ☐ **Pay Establishment Fee Only - $25 -** Deduct $65 Maintenance Fee from my transferred funds.

**Send transfer or rollover paperwork overnight for an additional $25?**   ☐ YES   ☐ NO

### TOTAL: $ 0.00

### PAYMENT/AUTHORIZATION

VISA   MasterCard   DISCOVER   AMERICAN EXPRESS

Card Number: _____

Expiration Date: _____

Card Code: _____

### BILLING INFORMATION ON CARD

First Name: _Cary_

Last Name: _Toone_

Address: _____

City: _____

State/Province: _____

Zip Code: _____

**Note:  Your credit card payment may not be processed on the same day it was received.**
**GoldStar does not keep credit card info on file.**



# THIRD PARTY AUTHORIZATION

**GOLDSTAR TRUST COMPANY**

P.O. Box 719
Canyon, TX 79015
(800) 486-6888
Fax (806) 655-2490
info@goldstartrust.com

## THIRD PARTY INFORMATION

First Name: **Brandee**   MI: ____   Last Name: **Nees**

Phone Number: **602-795-8000**   Email Address: ▮▮▮▮▮▮▮▮▮▮

Fax Number: **623-237-9866**   Relationship to Grantor: **Advisor**

Firm Name (if applicable): _____

Address: **6910 E. Chauncey Ln #230**

City: **Phoenix**   State/Province: **Az**

Country: **US**   Postal Code: **85054**

## THIRD PARTY DESIGNATION

I, the undersigned Account Owner, hereby give the individual designated herein third party the authorization(s) checked below.
**CHECK ALL THAT APPLY.** Discuss my account with GoldStar Trust Company ("GoldStar") by way of:

[✔] Email   [✔] Fax   [✔] Phone

## DESIGNATED THIRD PARTY'S SIGNATURE

I, the undersigned, hereby accept my appointment as designated third party by the above Account Owner, and in that capacity I agree to be bound by all terms and conditions that govern the Account owner's account at GoldStar.

_Third Party Signature_   Date: **3/21/19**

## ACCOUNT OWNER'S ACKNOWLEDGEMENT AND SIGNATURE

I understand that it is my sole responsibility to name authorized designated third party. GoldStar shall honor the authorization(s) to provide account information to the designated third party until such time as GoldStar receives written notice from me that such authorization(s) have been revoked. I, and not GoldStar, shall be liable for the acts and omissions of my designated third party. I agree to be bound by the actions of my designated third party.

Account Owner's Name (printed):

First Name: **Cary**   MI: ____   Last Name: **Toone**

GoldStar Account Number(s): _____
**LIST ALL THAT APPLY.**

_Account Owner Signature_   Date: _____

GTC Rev 2015/03



# GOLDSTAR
## TRUST COMPANY

### IRA PERIODIC DISTRIBUTION FORM

P.O. Box 719
Canyon, TX 79015
(800) 486-6888
Fax (806) 655-2490
info@goldstartrust.com

---

## IRA ACCOUNT OWNER

Name __Cary Toone__

Address ████████████████████████

Email _____

GoldStar Account # _____

IRA Type: ☒ Traditional  ☐ Roth
☐ SEP  ☐ SIMPLE

Daytime Phone _____

---

## TRADITIONAL, SEP or SIMPLE IRA DISTRIBUTION REASON

I direct the Custodian to make a distribution from my IRA for the following reason:

☒ Normal Distribution
☐ Disability
☐ Direct Rollover to Employer Plan

☐ Early Distribution (IRS Penalty Applies)
☐ Early Distribution (IRS Penalty Exception)

☐ Early SIMPLE IRA Distribution
☐ Death

---

## ROTH IRA DISTRIBUTION REASON

I direct the Custodian to make a distribution from my ROTH IRA for the following reason:

☐ Qualified Distribution
☐ Disability

☐ Early Distribution
☐ Roth Distribution, Over Age 59 1/2

☐ Death

---

## AMOUNT AND METHOD OF WITHDRAWAL

*Recurring Distributions (Please check one in each row)*

**Amount:** ☒ All Cash Available  ☐ Fixed Dollar Amount $_____  ☐ Interest  ☐ Principal

**Frequency:** ☒ Monthly  ☐ Bi-Monthly  ☐ Quarterly  ☐ Semi-annually  ☐ Annually
(does not apply to annual Required Minimum Distributions)

**Distribution Date (funds will be received the next business day):** ☐ 1st of month  ☒ 15th of month  ☐ 26th of month

**Begin:** ☒ As Soon As Possible   OR  ☐ Starting on _____ / _____ / 20 _____

---

## WITHHOLDING ELECTION (Please Check One):

☐ Withhold Federal income tax at a rate of _____% (not less than 10 percent) from the amount withdrawn.
Withhold additional Federal income tax of _____.

---

☒ I elect not to have Federal income tax withheld. I understand that I am still liable for the payment of Federal income tax on the amount of any distributions received. I also understand that I may be subject to Federal income tax penalties under the estimated tax payments rules if my payments of the estimated tax and withholding are insufficient. Effective _____ / _____ / 20 _____.

continues on page 2 ➡

# IRA PERIODIC DISTRIBUTION FORM, CONT...

## PAYMENT DELIVERY INSTRUCTIONS (Please Check One):

☐ 1. **Direct payment by check.** ($5.00 Check Fee Applies)

☒ 2. **Direct payment via ACH fund transfer.** (No charge) **PLEASE FILL OUT THE BOTTOM SECTION OF THIS FORM FOR DIRECT DEPOSIT.**

☐ 3. **Direct payment via Bank Wire.** A $25.00 wire fee applies. Attach wiring instructions for your banking institution (Name of bank and bank's physical address, routing number and account number).

☐ 4. **Alternate payment instructions.** (Complete only if different than name or address on account. Signature Guarantee Required)

_____

_____

### RECIPIENT'S ACKNOWLEDGEMENT AND SIGNATURE

I certify that I am the proper party to receive payment(s) from this account and that all information provided by me is true and accurate. I expressly assume the responsibility for any adverse consequences which may arise from this withdrawal and I agree that the Custodian shall in no way be held responsible.

X _Cary Toone_____
IRA Holder Signature

Date_____

### MEDALLION SIGNATURE GUARANTEE
(A Medallion Stamp is required if funds are sent to an address other than the address of record)

---

## DIRECT DEPOSIT PAYMENT ELECTION (complete if you checked #2 above)

I have elected to have the selected IRA distribution(s) directly deposited into my bank account. I understand that due to the ACH reporting limitations of most banks, a detailed summary of each payment sent to my bank may not be reported to me by my bank, and that I will obtain this information through the GoldStar website.

## BANK INFORMATION

Bank Name: ▇▇▇▇▇▇▇▇          Bank Phone: _____

Bank Address: _____

City: _____ State: _____ Zip: _____

Name on Bank Account: ▇▇▇▇▇▇   _Cary Toone_____

Routing / ABA Number: ▇▇▇▇▇▇▇▇▇▇▇▇ (must be 9 digits in length)

Bank Account Number: ▇▇▇▇▇▇▇▇▇▇▇

**Note:** It takes 5 business days from the day GoldStar receives your request to establish ACH service and electronically confirm the account with your bank.

I hereby authorize GoldStar Trust Company to initiate credit entries and to initiate, if necessary, debit entries and adjustments for any credit entries in error to my account at the bank named above. I authorize the bank to accept any such credits or debits to my account without responsibility for their correctness. I further agree that GoldStar Trust Company will not incur any loss, liability, cost, or expense for acting upon this request. I understand that this authorization may be terminated by me at any time by written notification to GoldStar Trust Company and to the bank. The termination request will be effective as soon as GoldStar Trust Company has had a reasonable amount of time to act upon it.

### SIGNATURE GUARANTEE - ONLY IF APPLICABLE
If the name on your bank account is not identical to the name on your GoldStar account(s), you must have your signature guaranteed. If your name is listed on a joint bank account, a signature guarantee is not necessary. If a signature guarantee is necessary and you do not provide one, GoldStar cannot establish this option on your account. You can obtain a signature guarantee from an authorized member of a bank, broker, or other qualified financial institution. A notary public cannot provide a signature guarantee.

**IMPORTANT:** If you are required to obtain a signature guarantee (see right), do not sign below until you are in the presence of an authorized officer.

X _Cary Toone_____
Account Holder Signature

Date _3/21/19_

### AUTHORIZED OFFICER TO PLACE STAMP HERE



## SUMMARY OF TERMS

This document dated ___9-26___ 2019 will serve as a summary to the PPM Agreement.

Amount of Investment: $ 30,000.00

Annual Rate: 8.00%

Payment requested: (Monthly)   Semi-Annual   Annual   Growth

Term:  48 months

Receipt of funds date: _____

Payment start date (minimum of 45 days from today): _____

Payment will always be postmarked no later than 5th of the Month

Signed and mutually agreed by:

_____

Barry M. Rybicki

EquiAlt Fund II, LLC.

_Cary B. Toone_
CARY  B.  TOONE

Q.Y.

Name of Prospective Purchaser: __Cary B. Toone__

State of Domicile: _____AZ_____



## EQUIALT FUND II, LLC

### PROSPECTIVE PURCHASER QUESTIONNAIRE

**INSTRUCTIONS:**  IN ORDER TO INVEST IN EQUIALT FUND, LLC, YOU MUST COMPLETE THIS INVESTOR QUESTIONNAIRE BY FILLING IN THE INFORMATION CALLED FOR, CHECKING THE APPROPRIATE BOXES, AND SIGNING AT PAGE 3.  THEN, YOU MUST COMPLETE THE SUBSCRIPTIONS AGREEMENT BY DESIGNATING THE NUMBER OF UNITS TO BE PURCHASED, PROVIDING THE INFORMATION REQUIRED AND SIGNING.  NO SUBSCRIPTION IS EFFECTIVE UNTIL ACCEPTED BY THE COMPANY.

**CONFIDENTIALITY:**  THE INFORMATION THAT YOU PROVIDE WILL BE USED SOLELY FOR THE PURPOSES OF MAKING VARIOUS DETERMINATIONS IN CONNECTION WITH THE COMPANYS' COMPLIANCE WITH APPLICABLE SECURITIES LAWS.  NO FINANCIAL INFORMATION DISCLOSED HEREIN WILL BE DISCLOSED TO THIRD PARTIES OR USED FOR ANY PURPOSES OTHER THAN SUCH LEGAL DETERMINATIONS BY THE COMPANY AND ITS LEGAL COUNSEL.

C.7.

# EQUIALT FUND II, LLC

### PROSPECTIVE PURCHASER QUESTIONNAIRE

TO:     EQUIALT FUND II, LLC

c/o DLA Piper

2000 Avenue of the Stars

Suite 400 North Tower

Los Angeles, CA 90067-4704

Ladies and Gentlemen:

In connection with the proposed purchase of Class A membership units (the "Securities") in EquiAlt Fund II, LLC (the "Company"), the undersigned hereby represents as follows:

1.  **Representations as to Accredited Investor Status.** The undersigned has read the definition of "Accredited Investor" from Rule 501 of Regulation D attached hereto as "Exhibit A", and certifies that either (circle only one):

    A.  The undersigned is an "Accredited Investor" for one or more of the following reasons (circle all                                                                        that apply):

        a.  The undersigned is an individual (not a partnership, corporation, etc.) whose individual net worth, or joint net worth with his or her spouse, presently exceeds $1,000,000;

        b.  The undersigned is an individual (not a partnership, corporation, etc.) who had an income in excess of $200,000 in each of the two most recent years, or joint income with their spouse in excess of $300,000 in each of those years (in each case including foreign income, tax exempt income and full amount of capital gains and losses but excluding any income of other family members and any unrealized capital appreciation) and has a reasonable expectation of reaching the same income level in the current year;

        c.  The undersigned is a director or executive officer of the Company, which is issuing and selling the Securities;

        d.  The undersigned is a corporation, partnership, business trust, or non-profit organization within the meaning of Section 501(c)(3) of the Internal Revenue Code, in each case not formed for the specific purpose of acquiring the Securities and with total assets in excess of $5,000,000; (describe entity): _____ _____ _____ _____

        e.  The undersigned is a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Securities, where the purchase is directed by a "sophisticated person" as defined in Regulation 506(b)(2)(ii);

C.7.

f.   The undersigned is an entity all the equity owners of which are "Accredited Investors" within one or more of the above categories.  If relying upon this Category alone, each equity owner must complete a separate copy of this Agreement: (describe entity)

_____

B.   The undersigned is not an "Accredited Investor."  However, the undersigned represents and warrants the following:

( RETIRED )

The undersigned is an individual whose individual net worth, or joint net worth with his or her spouse, if applicable, is approximately $ **500,000** ;

The undersigned had an income of approximately $_____ in 2018, and has a reasonable expectation of earning an annual income of approximately $ **50,000** in the current year.

✻ EXISTING EQUIA+ / GOLD STAR CLIENT

2.   **Entity Type.**  The undersigned is (circle only one):

A - An individual

B - A corporation

C - A partnership

D - A trust

E - Other

3.   **Tax I.D. Number.**  The social security number of federal tax ID number of the undersigned is:

[redacted]

4.   **Address.**  The address of the undersigned is:

[redacted]

_____

The phone, fax and contact person (if an entity) are as follows:

Phone:   [redacted]

Fax:     _____

Email:   _____

Contact: _____

C.7.

5.  **Investment Intent.** By the execution of this questionnaire, the undersigned represents to the Company that the undersigned: (a) understands that the offering of the Securities has not been and will not be registered under the Securities Act of 1933, as amended, or state securities laws, by reason of claimed exemptions under the provisions of such laws which depend, in part, upon the undersigned's investment intention, (b) is purchasing or would purchase the Securities for the undersigned's own account for investment and not with a view toward the resale or distribution to others, and (c) was not formed for the specific purpose of purchasing securities of the Company.

The foregoing representation is true and accurate as of the date hereof and shall be true and accurate as of the date of Closing.  If in any respect such representation shall not be true and accurate prior to Closing, the undersigned shall give immediate notice of such fact to the management of the Company.

Dated: __9·26·19__

Very truly yours,

Print name of Investor: Cary B. Toone         Print Name of Joint Investor:
_____

Signature: _Cary B. Toone_          Signature: _____

Print Title (if applicable): _____      Print Title (if applicable): _____

C.7.

**EXHIBIT A**

**Rule 501. Definitions and Terms Used in Regulation D.**

As used in Regulation D, the following terms have the meaning indicated:

**Accredited Investor.** "Accredited Investor" shall mean any person who comes within any of the following categories, at the time of the sale of the securities to that person:

1.  Any bank as defined in section 3(a)(2) of the Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; insurance company as defined in Section 2(13) of the Act; investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of the Act; Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301 (c) or (d) of the Small Business Investment Act of 1958; employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000; or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

2.  Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

3.  Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

4.  Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of the issuer;

5.  Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

6.  Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

C.7.

7.  Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii); and

8.  Any entity in which all of the equity owners are accredited investors.

# SUBSCRIPTION AGREEMENT

## FOR

## EQUIALT FUND II, LLC

### A Nevada limited liability company

THIS SUBSCRIPTION AGREEMENT (the "Agreement") is made by and among EquiAlt Fund II, LLC, a Nevada limited liability company (the "Company"), and the individuals and/or entities purchasing the securities hereunder (individually, a "Subscriber" and collectively, the Subscribers").

WHEREAS, the Company desires to issue up to a maximum of Fifty Million (50,000,000) units of Class A membership interest (the "Maximum Offering") to certain Accredited Investors, as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Act")

WHEREAS, each Subscriber has been furnished with an executive summary of this offering, a copy of the Company's operating agreement, an accredited investor questionnaire, this Agreement and the Risk Factors incorporated into the Agreement, as such may have been amended or supplemented from time to time (collectively, the "Offering Documents"); and

WHEREAS, the Subscriber desires to purchase that number of units set forth on the signature page hereof on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual representations and covenants set forth herein, the parties agree as follows:

1. Purchase and Sale of Units.

    1.1. Purchase of Units.  Subject to the terms and conditions of this Agreement, the Subscribers agree to purchase at the Closings that number of units up to an aggregate of Fifty Million (50,000,000) units of Class A membership interest at a purchase price of Ten Dollars ($10.00) per unit, as may be subscribed to by the Subscribers in this offering.  The Units issued to the Subscribers pursuant to this Agreement (including counterpart versions hereof) shall be referred to herein as the "Units".

    1.2. Company reservation of Rights to Terminate or Deny.  The Company reserves the right to refuse all or part of any or all subscriptions.  Furthermore, no Subscription Agreement shall be effective until accepted and executed by the Company and the Company shall have the right, in its sole discretion, for any reason or for no reason, to refuse any potential Subscribers.

2. Closing and Delivery.

    2.1. Initial Closing Date.  The initial purchase and sale of the Units shall take place at such time and place as the Company determines (the "Initial Closing").  At the Initial Closing, the Company shall deliver to each Subscriber a certificate representing the Units to be purchased in the Closing by the Subscriber.  The purchase price for the Units is payable by check or wire transfer payable to the Company or its designee in an amount equal to the applicable purchase

price per unit multiplied by the number of Units being purchased by such Subscriber.  Each Subscriber hereby authorizes and directs the Company to deliver the Units to be issued to the Subscriber pursuant to this Agreement directly to the Subscriber at the residential or business address indicated on the signature page hereto.

2.2.  <u>Subsequent Closings.</u>  The Company may conduct subsequent closings on an interim basis (each referred to as a "Closing"), until the Maximum Offering amount has been reached (subject to increase in the event of oversubscription of the offering).  All such sales shall be made on the terms and conditions set forth in this Agreement.  Any Units sold pursuant to this Section 2.2 shall be deemed to be "Units" and any Subscribers thereof shall be deemed to be "Subscribers" for all purposes under this Agreement.

3.  <u>Representations and Warranties of the Company.</u>  The Company hereby represents and warrants to the Subscribers that:

3.1.  <u>Organization, Good Standing and Qualification.</u>  The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as now conducted and as proposed to be conducted.  The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure so to qualify would have a material adverse effect on its business or properties.

3.2.  <u>Authorization.</u>  All action on the part of the Company, and its managers, necessary for the authorization, execution and delivery of this Agreement and the issuance of the Units, the performance of all obligations of the Company hereunder and there under has been taken or will be taken prior to the Closing, and this Agreement constitutes a valid and legally binding obligation of the Company, enforceable in accordance with its terms.

3.3.  <u>Valid Issuance of Units.</u>  (A) The Units, when issued, sold and delivered in accordance with the terms hereof for the consideration expressed herein or therein, will be duly and validly issued and fully-paid and non-assessable. Based in part upon the representations of the Subscribers in this Agreement and subject to the completion of the filings referenced below, the Units will be issued in compliance with all applicable federal and state securities laws. (B) The Units, are or as of the Initial Closing will be, duly and validly authorized and issued, fully-paid, and were or will be issued in compliance with all applicable federal and state laws.

3.4.  <u>Governmental Consents.</u>  No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local government authority on the part of the Company is required in connection with the consummation of the transactions contemplated by this Agreement, except for the Federal and State Securities Law Filings to be made by the Company as necessary.

3.5.  <u>Litigation.</u>  There is no action, suit, proceeding or investigation pending or currently threatened against the Company that questions the validity of the Agreement, or the right of the Company to enter into this Agreement, or to consummate the transactions contemplated hereby, or that might result,

either individually or in the aggregate, in any material adverse changes in the assets, condition, affairs or prospects of the Company, financially or otherwise, or any change in the current equity ownership of the Company, nor is the Company aware that there is any basis for the foregoing. The Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality. There is no action, suit, proceeding or investigation by the Company currently pending or which the Company intends to initiate.

3.6. Compliance with Other Instruments. The Company is not in violation or default of any provisions of its Articles of Organization or Operating Agreement or of any instrument, judgment, order, writ, decree or contract to which it is a party or by which it is bound or, to its knowledge, of any provision of federal or state statute, rule or regulation applicable to the Company. The execution, delivery and performance of the Agreement, and the consummation of the transactions contemplated hereby, will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, order, writ, decree or contract or an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company.

3.7. Disclosure. The forward-looking statements, including financial projections, contained in the Offering Documents were prepared in good faith; however, the Company does not warrant that such statements will ultimately become true. In addition to the foregoing, the Company restates as if rewritten herein the Risk Factors attached hereto as Schedule I as if fully rewritten herein and the following:                    (A) *No Independent Studies*. The determination of the Company's capital requirements and the intended use of proceeds from this Offering is based solely upon information developed by the Company. No independent studies with regard to feasibility, management, or marketing have been conducted by any third parties in determining the Company's capital requirements or requirements.                    (B) *Structure of the Offering*. The Units are being sold through the Company without commissions. The Offering is being conducted on a "best efforts" basis.

4. Representations and Warranties of the Subscribers. Each Subscriber hereby severally and not jointly represents and warrants to the Company that:

4.1. Risk. The Subscriber recognizes that the purchase of the Units involves a high degree of risk in that (i) the Company has limited operation history; (ii) an investment in the Company is highly speculative, and only investors who can afford the loss of their entire investment should consider investing in the Company and the Units; (iii) the Subscriber may not be able to liquidate his, her or its investment; and (iv) transferability of the Units is extremely limited.

4.2. Accredited Investor. The Subscriber represents that the Subscriber is an officer, director or equivalent of the Company, and /or is an "Accredited Investor," as such term is defined in Rule 501 of Regulation D promulgated under the Act, and that the Subscriber is able to bear the economic risk of an investment in the Units.

C.7.

4.3. <u>Investment Experience.</u> The Subscriber hereby acknowledges and represents that the Subscriber has prior investment experience, including investment in non-listed and unregistered securities, or the Subscriber has employed the services of an investment advisor, attorney and/or accountant ro read all of the documents furnished or made available by the Company both to the Subscriber and to all other prospective investors in the Units and to evaluate the merits and risks of such an investment on the Subscriber's behalf.

4.4. <u>Due Diligence.</u> The Subscriber hereby acknowledges receipt and careful review of the Offering Documents, as supplemented and amended, and the attachments and exhibits thereto all of which constitute an integral part of the Offering Documents, and hereby represents that the Subscriber has been furnished by the Company during the course of this transaction with all information regarding the Company which the Subscriber has requested or desired to know, has been afforded the opportunity to ask questions of and receive answers from duly authorized managers, officers or other representatives of the Company concerning the terms and conditions of the offering and has received an additional information which Subscriber has requested.

4.5. <u>Protection of Interests; Exempt Offering.</u> The Subscriber hereby represents that the Subscriber either by reason of the Subscriber's business or financial experience or the business or financial experience of the Subscriber's professional advisors (who are unaffiliated with and who are not compensated by the Company or any affiliate of the Company, directly or indirectly) has the capacity to protect the Subscriber's own interests in connection with the transaction contemplated hereby.  The Subscriber hereby acknowledges that the offering has not been reviewed by the United States Securities and Exchange Commission (the "SEC") because of the Company's representations that this is intended to be exempt from the registration requirements of Section 5 of the Act.  The Subscriber agrees that the Subscriber will not sell or otherwise transfer the Units unless they are registered under the Act or unless an exemption from such registration is available.

4.6. <u>Investment Intent.</u> The Subscriber understands that the Units have not been registered under the Act by reason of a claimed exemption under the provisions of the Act which depends, in part, upon the Subscriber's investment intention.  In this connection, the Subscriber hereby represents that the Subscriber is purchasing the Units for the Subscriber's own account for investment and not with a view toward the resale or distribution to others. The Subscriber, if an entity, was not formed for the purpose of purchasing the Units.

4.7. <u>Restricted Securities.</u> The Subscriber understands that there currently is no public market for any of the Units and that even if there were, Rule 144 promulgated under the Act requires, among other conditions, a one-year holding period prior to the resale (in limited amounts) of securities acquired in a non-public offering without having to satisfy the registration requirements under the Act.  The Subscriber understands and hereby acknowledges that the Company I under no obligation to register the Units under the Act or any state securities or "blue sky" laws.  The Subscriber consents that the Company may, if it desires, permit the transfer of the Units out of the Subscriber's name only when the Subscriber's request for transfer is accompanied by an opinion of counsel reasonably satisfactory to the Company that neither the sale nor the

proposed transfer results in a violation of the Act or any applicable state "blue sky" laws (collectively, the "Securities Laws"). The Subscriber agrees to hold the Company and is members, manager, officers, employees, controlling persons and agents and their respective heirs, representatives, successors and assigns harmless and to indemnify them against all liabilities, cost and expenses incurred by them as a result of any misrepresentation made by the Subscriber contained in this Agreement or any sale or distribution by the Subscriber in violation of the Securities Laws. The Subscriber understands and agrees that in addition to restrictions on transfer imposed by applicable Securities Laws, the transfer of the Units will be restricted by the terms of this Agreement.

4.8. <u>Legends.</u> The Subscriber consents to the placement of a legend on any certificate or other document evidencing the Units that such Units have not been registered under the Act or any state securities or "blue sky" laws and setting forth or referring to the restrictions on transferability and sale thereof contained in the Agreement. The Subscriber is aware that the Company will make a notation in its appropriate records with respect to the restrictions on the transferability of such Units and may place additional legends to such effect on Subscriber's unit certificate(s).

4.9. <u>Rejection.</u> The Subscriber understands that the Company will review this Agreement and that the Company reserves the unrestricted right to reject or limit any subscription and to close the offering to the Subscriber at any time.

4.10. <u>Address.</u> The Subscriber hereby represents that the address of the Subscriber furnished by the Subscriber on the signature page hereof is the Subscriber's principal residence.

4.11. <u>Authority.</u> The Subscriber represents that he or she has full power and authority to execute and deliver this Agreement and to purchase the Units. This Agreement constitutes the legal, valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms.

5. <u>Limitations on Transfer</u>.

5.1. <u>Company Right of First Refusal.</u> The Subscribers shall not assign, encumber or dispose of any interest in any of the Units except in compliance with applicable state and federal laws.

6. <u>Miscellaneous</u>.

6.1. <u>Survival of Representations and Warranties</u>. The warranties, representations and covenants of the Company contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing for a period of one (1) year following the last Closing.

6.2. <u>Governing Law</u>. NOTWITHSTANDING THE PLACE WHERE THIS AGREEMENT MAY BE EXECUTED BY ANY OF THE PARTIES HERETO, THE PARTIES EXPRESSLY AGREE THAT ALL THE TERMS AND PROVISIONS HEREOF SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEVADA WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

6.3. <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.4. <u>Titles and Subtitles</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.5. <u>Notices</u>.  (A) All notices, request, demand and other communications under this Agreement or in connection herewith shall be given to or made upon the respective parties as follows: if to the Subscribers, to the addresses set forth on the signature page hereto, or, if to the Company, to EquiAlt Fund, LLC, c/o Duane Morris LLP, Attn: Paul R. Wassgren, 100 N. City Parkway, Suite 1560, Las Vegas, Nevada 89106.                (B) All notices, requests, demands and other communications given or made in accordance with the provisions of the Agreement shall be in writing, and shall be sent by certified or registered, return receipt requested, or by overnight courier or telecopy (facsimile) with confirmation of receipt, and shall be deemed to be given or made when receipt is so confirmed.
(C) Any party may, by written notice to the other, alter its address or respondent and such notice shall be considered to have been given ten (10) days after the airmailing, telexing or telecopying thereof.

6.6. <u>Brokers</u>.  (A) Each Subscriber severally represents and warrants that it has not engaged, consented to or authorized any broker, finder or intermediary to act on its behalf, directly or indirectly, as a broker, finder or intermediary in connection with the transactions contemplated by this Agreement.  Each Subscriber hereby severally agrees to indemnify and hold harmless the Company from and against all fees, commissions or other payments owing to any such person or firm acting on behalf of such Subscriber hereunder.  The Company will pay finder's fees only in compliance with applicable law.     (B) The Company agrees to indemnify and hold harmless the Subscribers from and against all fees, commissions or other payment owing by the Company to any other person or firm acting on behalf of the Company hereunder.

6.7. <u>Expenses</u>.  If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

6.8. <u>Third Parties</u>.  Nothing in the Agreement shall create or be deemed to create any rights in any person or entity not a party to this Agreement.

6.9. <u>Amendments and Waivers</u>.  Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and Subscribers holding a majority in interest of the Units purchased in the offering.

6.10. <u>Severability</u>.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

6.11. <u>Entire Agreement</u>.   This Agreement and the other Offering Documents constitute the entire agreement between the parties hereto pertaining to the subject matter herof, and any and all other written or oral agreements existing between the parties hereto are expressly canceled.

*(Signature page follows.)*

*C:7.*

This Subscription Agreement has been executed as of the date last set forth below.

NUMBER OF UNITS: _____

$10.00 PER UNIT

FOR THE AGGREGATE PURCHASE PRICE: $ *30,000* _____

**SUBSCRIBER:**

Print or Type Name of Subscriber: __*Cary B. Toone*_____

Signature: *Cary B. Toone*_____   Second Signature if Jointly: _____

Title of Signatory: _____
If jointly subscribed manner in which Title to be held:
_____

Address: ████████████████ _____
         ████████████████ _____

Telephone: ███████████ _____

Facsimile: _____

Tax I.D. #: ████████ _____

Dated: __*9.26.19*_____

*C7.*

This Subscription Agreement is agreed to and accepted as of _____

**EQUIALT FUND II, LLC**

**a Nevada limited liability company**

By:     EquiAlt Fund II, LLC

        a Nevada limited liability company

        its Manager

        By:_____

        EquiAlt Fund II, its Manager



**Beneficiary Information:**  The following individual(s) or entity(ies) shall be my primary and/or contingent beneficiary(ies) of this account. If neither primary nor contingent is indicated, the individual or entity will be deemed to be a primary beneficiary. If more   than one primary beneficiary is designated and no distribution percentages are indicated, the beneficiaries will be deemed to own equal share percentages. Multiple contingent beneficiaries with no share percentages indicated will also be deemed to share equally. If any primary or contingent beneficiary dies before I do, his or her interest and the interest of his or her heirs shall terminate completely, and the percentage share of any remaining beneficiary(ies) shall be increased on a pro rata basis. If no primary beneficiary(ies) survives me, the contingent beneficiary(ies) shall acquire the designated share of the account.

**Beneficiary Information**

Name: Sophia D. Toone
Address: ███████████
City: ████████   State: ███   Zip: ███████
Share %: 100   Relationship: ████████
What type of Beneficiary is this?  Primary

**Beneficiary 2**
First Name: Krystalyn   Last Name: Leeb
Address: ███████
City: ████████   State: ███   Zip: ███████
Share %: 50   Relationship: ████████
What type of Beneficiary is this? contingent

**Beneficiary 3**
First Name: William   Last Name: Bowerbank
Address: ███████████
City: ████████   State: ███   Zip: ████
Share %: 50   Relationship: ████████
What type of Beneficiary is this? contingent



## Direct Deposit Agreement Form

### Authorization Agreement

I hereby authorize EquiAlt to initiate automatic deposits to my account at the financial institution named below. I also authorize EquiAlt to make withdrawals from this account in the event that a credit entry is made in error.

Further, I agree not to hold EquiAlt responsible for any delay or loss of funds due to incorrect or incomplete information supplied by me or by my financial institution or due to an error on the part of my financial institution in depositing funds to my account.

This agreement will remain in effect until EquiAlt receives a written notice of cancellation from me or my financial institution, or until I submit a new direct deposit form to the Payroll Department.

### Account Information

Name of Financial Institution:

Routing Number:

Account Number:

☒ Checking | ☐ Savings

### Signature

| | | | |
|---|---|---|---|
| Authorized Signature (Primary): | _Cary B. Moore_ | Date: | 9.26.19 |
| Authorized Signature (Joint): | | Date: | |

**Please attach a voided check or deposit slip and return this form to the Payroll Department.**



## Debenture Modification Request

Every investor has a fixed contract with the entity they are invested in called a Debenture. If for any reason an investor wishes to change any of the terms of the Debenture a request for this change must be followed. A change to the debenture includes such events as; request for partial or full return of investment prior to maturity or a change in term status (i.e. Monthly, Quarterly, Semi-Annual, Annual, or Growth).

Procedure:

If a customer wishes to modify, amend or change the terms to the initial investment the procedure is as follows;
1. Customer is to complete the Request to Amend form.
2. EquiAlt Management will review all requests submitted in the first week of the month if they are submitted completely by the first of the month.
3. EquiAlt Management will communicate the approval or denial of the request by the 15th of the corresponding month.
4. Investment type change requests can take up to 90 Days to be processed.
5. Early redemption requests are processed quarterly. If approved, the redemption process will begin in the 2nd quarter from the quarter in which the request was made:

The decision will be based on various business related factors at that time and order in which requests are made.

Every approved request will have attached the following features:

1. A best efforts timeline for the change of the debenture,
2. For early redemptions a 10% surrender fee charge based on the amount requested for the approved modification. The charge will be taken at the time of the approved request.
3. For investment type changes from growth to income a one time fee of $1,000.00 will apply. The charge will be taken at the time of the approved request.

Debenture Information needed to process the request:

1. Date of initial investment,
2. Entity invested,
3. Trust Company Used,
4. Investor Relations contact,
5. Amount of initial investment,
6. Amount of request,
7. Amount of remaining investment (if any),
8. Terms of the remaining Investment (if any).

Once all this is received, the request will be submitted for the next months evaluation on the availability of the entity to reasonably satisfy the request.

Signature _Cory B. Toone_   Date _4-26-19_

Name _Cory B. Toone_