**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**Case No. 8:20-cv-00448-WFJ-TGW**

STEVEN J. RUBINSTEIN and
TRACEY F. RUBINSTEIN, as trustees for
THE RUBINSTEIN FAMILY LIVING
TRUST DATED 6/25/2010, and
CARY B. TOONE, individually and
FBO CARY B. TOONE IRA,
RONALD WEBB, individually and
FBO RONALD WEBB IRA,
JUDITH TUGGLE, individually,
HANS ALBERT and JANETTE ALBERT, individually, and
FBO HANS ALBERT IRA,
GEORGIA F. MURPHY, individually,
HAROLD HAMMON, individually and
FBO HAROLD HAMMON IRA,
NORA CARRASCO, individually and
FBO NORA CARRASCO IRA,
CAROLYNN L. SCHOCH, individually and
FBO CAROLYNN L. SCHOCH IRA,
KATHLEEN P. SMITH, individually and
FBO KATHLEEN P. SMITH TRADITIONAL IRA,
RICHARD J. GLEINN and PHYLLIS A. GLEINN, individually,
MARJORIE A. KUJAWA as beneficiary of the
ESTATE OF DENNIS KUJAWA,
GERALD W. HOFSETTER and SANDRA L. HOFFSETTER, as trustees for
GERALD W. AND SANDRA L. HOFFSETTER REVOCABLE FAMILY TRUST,
BRUCE R. HANNEN and GERALDINE MARY HANNEN, individually,
NORA CARRASCO, individually, and
FBO NORA CARRASCO TRADITIONAL IRA,
SHARON YEN SHIH WONG, individually, and
FBO SHARON YEN SHIH WONG IRA,
ELLEN MOGENSEN, individually,
SHIRLEY J. BENZ and CHARLES GLENN BENZ,
individually and FBO SHIRLEY J. BENZ IR and
FBO CHARLES GLENN BENZ IRA, individually,
and on behalf of all others similarly situated,

     Plaintiffs,

v.

**CONSOLIDATED CLASS ACTION
AMENDED COMPLAINT**

**JURY DEMAND**

1

TONY JAMES MICHAEL KELLY, a Florida individual,
FAMILY TREE ESTATE PLANNING, LLC,
an Arizona limited liability company,
JASON PAUL WOOTEN, an Arizona individual,
TIM LADUCA, an Arizona individual,
BRAD MASON, an Arizona individual,
AMERICAN FINANCIAL SECURITY, LLC,
an Arizona limited liability company,
AMERICAN FINANCIAL INVESTMENTS, LLC,
an Arizona limited liability company,
RONALD F. STEVENSON, an Arizona individual,
JOSEPH FINANCIAL INVESTMENT ADVISORS, LLC,
a California limited liability company,
JOSEPH FINANCIAL INC., a California company,
ROBERT JOSEPH ARMIJO, a California individual,
ANDRE SEARS, a Nevada individual,
d/b/a PICASSO GROUP,
MARIA ANTONIO-SEARS, a Nevada individual,
AMERICAN SENIOR BENEFITS LLC,
an Arizona limited liability company,
JAMES GRAY, an Arizona individual,
ELLIOTT FINANCIAL GROUP, INC., an Arizona corporation,
ELLIOTT FINANCIAL ADVISORS, LLC, an Arizona limited liability company,
TODD REGAN ELLIOTT, an Arizona individual,
WEALTH PROTECTION PARTNERS, a California corporation,
YVETTE PAPAZIAN SPILLMAN, a California individual,
ALLSTATE FINANCIAL SERVICES, a Delaware corporation, and
ANTHONY BROWN, a Florida individual,
BENJAMIN MOHR, a California individual,
BEN MOHR, INC., a California corporation,
BEN MOHR LLC, a California limited liability company,
LIFELINE INNOVATIONS & INSURANCE SOLUTIONS LLC,
a Wyoming limited liability company,
JOHN ALBINO MARQUES, a California individual,
GREGORY TALBOT, a California individual,
THE FINANCIAL GROUP, LLC, an Arizona limited liability company, and
PATRICK J. RUNNINGER, an Arizona individual,

     Defendants.
_____/


## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Steven J. Rubinstein and Tracey F. Rubinstein, individually (the "Rubinsteins") and in their capacity as trustees for The Rubinstein Family Living Trust Dated 6/25/2010 (the "Rubinstein Trust") , Cary B. Toone ("Toone"), individually and for the benefit of the Cary B. Toone IRA ("Toone IRA"), Ronald Webb ("Webb"), individually and for the benefit of the Ronald Webb IRA ("Webb IRA"), Judith Tuggle ("Tuggle"), individually, Hans and Janette Albert (the "Alberts"), individually, and for the benefit of the Hans Albert IRA, Georgia F. Murphy ("Murphy"), individually, Harold Hammon, individually ("Hammon") and for the benefit of the Harold Hammon IRA ("Hammon IRA"), Nora Carrasco ("Carrasco"), individually and for the benefit of the Nora Carrasco Traditional IRA ("Carrasco IRA"), Carolynn L. Schoch ("Schoch"), individually and for the benefit of the Carolynn L. Schoch Traditional IRA ("Schoch IRA"), Kathleen P. Smith ("Smith"), individually and for the benefit of the Kathleen P. Smith Traditional IRA ("Smith IRA"), Richard J. Gleinn and Phyllis A. Gleinn (the "Gleinns"), individually, Bruce R. Hannan and Geraldine Mary Hannen, individually (the "Hannens"), Marjorie A. Kujawa ("Kujawa"), as beneficiary of the Estate of Dennis Kujawa, Gerald W. Hoffsetter and Sandra L. Hoffsetter (the "Hoffsetters"), as trustees for the Gerald W. and Sandra L. Hoffsetter Revocable Family Trust ("Hoffsetter Trust"), Sharon Yen Shih Wong ("Wong"), individually and for the benefit of the Sharon Yen Shih Wong IRA ("Wong IRA"), and Ellen Mogensen ("Mogensen"), Shirley J. Benz and Charles Glenn Benz, individually (the "Benzes"), and FBO Shirley J. Benz IRA ("S. Benz IRA") and Charles Glenn Benz IRA ("C. Benz IRA") (collectively, "Plaintiffs"),[1]

---

[1] Plaintiffs' counsel currently represents additional investors not named in this Class Action Complaint because those individuals purchased EquiAlt's securities from Defendants already named herein and it would inefficient to include more proposed class representatives than are required. These investors reserve their right to timely intervene as individual plaintiffs in this action in the event that the Court denies class certification in this case, as permitted by *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny. *See China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804 (2018) (explaining that "*American Pipe* tolls the statute of

on behalf of themselves and all others similarly situated, sue Tony James Michael Kelly, a Florida individual ("Kelly"), Family Tree Estate Planning, LLC, an Arizona limited liability company ("Family Tree"), Jason Paul Wooten, an Arizona individual ("Wooten"), Tim LaDuca, an Arizona individual ("LaDuca"), Sean Cagle, an Arizona individual ("Cagle"), American Financial Security, LLC, an Arizona limited liability company ("American Security"), American Financial Investments, LLC, an Arizona limited liability company ("American Investments"), Ronald F. Stevenson ("Stevenson"), Joseph Financial Investment Advisors, LLC, a California limited liability company ("Joseph LLC"), Joseph Financial Inc., a California corporation ("Joseph Financial"), Robert Joseph Armijo ("Armijo"), Andre Sears, a Nevada individual ("Sears"), d/b/a Picasso Group, Maria Antonio-Sears, a Nevada individual ("Antonio-Sears"), American Senior Benefits, LLC, an Arizona limited liability company ("American Senior"), James Gray, an Arizona individual ("Gray"), Elliott Financial Group, Inc., an Arizona corporation ("Elliott Financial"), Elliott Financial Advisors, LLC, an Arizona limited liability company ("Elliott LLC"), Todd Regan Elliott, an Arizona individual, Wealth Protection Partners, a California corporation ("Wealth Protection"), Yvette Papazian Spillman, a California individual ("Spillman"), Allstate Financial Services, a Delaware corporation ("Allstate Financial"), Anthony Brown ("Brown"), a Florida individual, Ben Mohr, a California individual ("Mohr"), Ben Mohr Inc., a California corporation ("Mohr Inc."), Ben Mohr LLC, a California limited liability company ("Mohr LLC"), Lifeline Innovations & Insurance Solutions LLC, a Wyoming limited liability company ("Lifeline"), John Albino Marques ("Marques"), a California individual, Gregory Talbot ("Talbot"), a California individual, The Financial Group LLC, an Arizona limited liability

---

limitations during the pendency of a putative class action, allowing unnamed class members to join the action individually or file individual claims if the class fails").

company ("Financial Group"), and Patrick J. Runninger, an Arizona individual (collectively, "Defendants"), and state:

## INTRODUCTION

1.      This is unfortunately a very familiar fact pattern, especially here in Florida. EquiAlt, LLC ("EquiAlt"), and its principals and officers, along with some very prominent aiders and abettors (some named now and some who will be named in the future after additional discovery), scammed more than 1,100 individuals from across the country out of much of their life savings in this classic Ponzi scheme. Most of the investors were senior citizens, mainly from Florida, Arizona, California, and Nevada, that together invested and lost more than $170 million dollars in this fraud. Evidence already uncovered reveals that Defendants conducted a classic Ponzi scheme, as explained in detail below and in the complaint already filed by the Securities and Exchange Commission in the SEC Action.

2.      Plaintiffs bring this action on behalf of themselves and a proposed class of nationwide class of investors in EquiAlt, and it associated real estate investment funds—EquiAlt Fund, LLC ("Fund 1"), EquiAlt Fund II, LLC ("Fund 2"), EquiAlt Fund III, LLC ("Fund 3"), EA SIP, LLC ("EA SIP Fund") (together, the "Funds")—to recover funds misused, commingled, and stolen by EquiAlt, a Tampa-based real estate firm, along with its Chief Executive Officer, Brian Davison, and its Managing Director, Barry Rybicki (together, the "EquiAlt Principals") with the aid and assistance of (a) EquiAlt's Chief Investment Officer, Defendant Kelly; and (b) sales agents for EquiAlit: Defendants Family Tree, Wooten, LaDuca, Cagle, and Mason; Defendants American Investments, American Security, and Stevenson; Defendants Joseph LLC, Joseph Financial, and Armijo; Defendants Picasso Group, Sears, and Antonio-Sears; Defendants American Senior and Gray; Defendants Elliott Financial, Elliott LLC, and Elliott; Defendants Wealth Protection and

Spillman, Defendants Allstate Financial and Brown; Defendants Mohr, Mohr Inc., and Mohr LLC; Defendants Lifeline, Marques, and Talbot; and Defendants Financial Group, and Runninger (together, the "Sales Agents").

3.      Plaintiffs are some of the individuals who invested the most money in the EquiAlt Ponzi scheme and have agreed to bring these claims not only on behalf of themselves, but also on behalf of all similarly situated investors that were all promised that substantially all of their money would be used to purchase real estate in distressed markets in the United States and that their investments would yield generous returns. Instead, EquiAlt, the EquiAlt Principals and various aiders and abettors, misappropriated millions of dollars in investor funds for their own personal use and benefit.

## FACTUAL BACKGROUND

4.      It has already been confirmed that Investor money has been misused and misappropriated in many distinct ways, including: (a) money from one real estate investment Fund used to improperly purchase real estate for another Fund or for third-party entities owned by Davison; (b) money from one Fund used to pay back investors in another Fund; (c) substantial undisclosed commissions paid to unregistered sales agents; (d) substantial undisclosed fees such as due diligence fees, management fees, success fees, auction fees, underwriting fees, purchase discount fees, and bonuses paid to EquiAlt and Davison; and (e) substantial improper distributions of cash to the EquiAlt Principals. As a result of this misuse and misappropriation of investors' funds, Fund 1, Fund 2, and the EA SIP Fund are in a precarious financial condition. Indeed, although EquiAlt raised over $170 million to make real estate investments, it currently owns only approximately $55.3 million in real property.

6

5.     In addition to conducting a Ponzi scheme and misappropriating investor money, the EquiAlt Principals and Defendants made material misrepresentations and omissions to investors. Specifically, the EquiAlt Principals and Defendants falsely told investors that their investments, consisting of unregistered securities in the form of debentures issued by four real estate investment firms managed by EquiAlt, were "secure," "safe," "low risk," and "conservative." Although EquiAlt claimed that these debentures were exempt from registration with the Securities and Exchange Commission ("SEC"), in truth they were non-exempt. The sale of these unregistered securities by Defendants therefore violated both state and federal securities laws.

6.     EquiAlt and the EquiAlt Principals perpetrated this Ponzi scheme with the knowledge and specific assistance of Defendant Kelly, EquiAlt's Chief Investment Officer, and Sears and Antonio-Sears, key members of the EquiAlt management team. Kelly was Davison's right-hand person in EquiAlt's Tampa office and handles much of the day-to-day events and actions. Kelly, Sears, and Antonio-Sears were knowledgeable about EquiAlt's fraudulent scheme and aided and abetted the fraudulent acts of the EquiAlt Principals, including the sale of EquiAlt's unregistered securities.

7.     The EquiAlt Principals also paid significant sales commission to numerous unregistered sales agents, including the Defendant Sales Agents. These Sales Agents sold investments to unaccredited and unsophisticated investors in various states. These Sales Agents aided and abetted EquiAlt in its violations of state and federal securities laws and violated common law duties to their customers.

8.     As a consequence of their active involvement in the EquiAlt Ponzi scheme, Defendants are liable for damages to all individuals, like Plaintiffs, who purchased EquiAlt's unregistered securities through the Defendants. Plaintiffs seek to represent a nationwide class of

7

individuals damaged by the Defendants' conduct, as well as classes of individuals from Florida, Arizona, California, and Nevada.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA") codified as 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs.

10.     This Court has personal jurisdiction over each Defendant because each Defendant was involved in the marketing and sale of EquiAlt's unregistered securities. EquiAlt's unregistered securities originated from EquiAlt, which is located in Tampa, Florida. As such, all Defendants have purposefully availed themselves of the laws of the State of Florida and have established minimum contacts with the State of Florida.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. In addition, Defendant Kelly is a resident of this district and operated out of the EquiAlt office in Tampa, Florida.

## PARTIES

12.     Plaintiff Steven J. and Tracey F. Rubinstein are individuals and spouses who now, and at all times mentioned herein, resides in the State of Arizona. Steven Rubinstein is a retired physical education instructor and senior citizen who was seeking a safe source of retirement income when he and his wife, Tracey, invested in EquiAlt. The Rubinsteins are trustees of the Rubinstein Family Living Trust Dated 6/25/2010, which invested in EquiAlt.

13.     Plaintiff Cary Toone is an individual who now, and at all times mentioned herein, resides in the State of Arizona. Toone invested in EquiAlt for the benefit of the Toone IRA.

14.     Plaintiff Ronald Webb is an individual who now, and at all times mentioned herein, resides in the State of Arizona. Webb invested in EquiAlt.

15.     Plaintiff Judith Tuggle is an individual who now, and at all times mentioned herein, resides in the State of Arizona. Tuggle invested in EquiAlt.

16.     Plaintiff Hans and Janette Albert are spouses and individuals who know, and at all times mentioned herein, reside in the State of Arizona. The Alberts invested in EquiAlt individually and also for the benefit of the Hans Albert IRA.

17.     Plaintiff Georgia F. Murphy is an individual who now, and at all times mentioned herein, resides in the State of California. Murphy invested in EquiAlt.

18.     Plaintiff Harold Hammon is an individual who now, and at all times mentioned herein, resides in the State of Arizona. Hammon invested in EquiAlt individually and for the benefit of the Hammon IRA.

19.     Plaintiff Nora Carrasco is an individual who now, and at all times mentioned herein, resides in the State of Florida. Carrasco invested in EquiAlt for the benefit of the Nora Carrasco Traditional IRA.

20.     Plaintiff Carolynn L. Schoch is an individual who now, and at all times mentioned herein, resides in the State of Arizona. Schoch invested in EquiAlt for the benefit of the Carolynn L. Schoh Traditional IRA.

21.     Plaintiff Kathleen P. Smith is an individual who now, and at all times mentioned herein, resides in the State of Arizona. Smith in EquiAlt for the benefit of the Kathleen P. Smith Traditional IRA.

22.     Plaintiffs Richard J. Gleinn and Phyllis A. Gleinn are spouses and individuals who now, and at all times mentioned herein, reside in the State of Florida. The Gleinns invested in EquiAlt.

23.     Plaintiffs Bruce R. Hannen and Geraldine Mary Hannen are spouses and individuals who now, and at all times mentioned herein, reside in the State of Arizona. The Hannens invested in EquiAlt.

24.     Plaintiff Marjorie A. Kujawa is an individual who now, and at all times mentioned herein, resides in the State of Arizona. Kujawa is the beneficiary of the Estate of Dennis Kujawa, Marjorie Kujawa's spouse, which invested in EquiAlt.

25.     Plaintiffs Gerald W. Hoffsetter and Sandra L. Hoffsetter are individuals who now, and at all times mentioned herein, resides in the State of Arizona. The Hoffsetters are trustee for the Gerald W. and Sandra L. Hoffsetter Revocable Family Trust, which invested in EquiAlt.

26.     Plaintiff Sharon Yen Shih Wong is a California individual who now, and at all times mentioned herein, resides in the State of California. Wong purchased investments in EquiAlt for the Benefit of the Wong IRA.

27.     Plaintiff Ellen Mogensen is an individual who now, and at all times mentioned herein, resides in the State of California. Mogensen purchased investments in EquiAlt.

28.     Plaintiffs Shirley J. Nez and Charles Glenn Benz are individual who now, and at all times mentioned herein, reside in the State of Arizona. The Benzes purchased investments in EquiAlt individually and for the benefit of the S. Benz IRA and the C. Benz IRA.

29.     Defendant Kelly is an individual who now, and at all times mentioned herein, resides in the State of Florida. Kelly was the Chief Investment Officer for EquiAlt and worked out

of EquiAlt's Tampa office as Davison's right-hand man. Kelly was intimately aware of and knowingly aided and abetted the Ponzi scheme perpetrated by EquiAlt and the EquiAlt Principals.

30.     Defendant Family Tree is an Arizona limited liability company with a principal place of business in Scottsdale, Arizona.

31.     Defendant Wooten is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that State. Defendant Wooten is the Principal of Family Tree and was involved in all Family Tree transactions for EquiAlt, including to Rubinstein, Smith, Toone, and Hammon.

32.     Defendant LaDuca is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that State. Defendant LaDuca is a certified estate planning consultant for Family Tree and sold EquiAlt's unregistered securities to persons that include the Rubinstein Plaintiffs.

33.     Defendant Mason is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that State. Defendant Mason is a senior estate planning consultant for Family Tree and sold EquiAlt's unregistered securities to persons that include Smith.

34.     Family Tree, Wooten, LaDuca, and Mason operated as a sales agent of EquiAlt, distributing sales materials to solicit investment in EquiAlt. Family Tree, Wooten, LaDuca and Mason processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their investments, including the reinvestment of funds. Family Tree, Wooten, Mason, and LaDuca were paid for their solicitation efforts.

35.     Defendant American Security is an Arizona limited liability company with a principal place of business in Prescott, Arizona.

36.     Defendant American Investments is an Arizona limited liability company with a principal place of business in Prescott, Arizona.

37.     Defendant Stevenson is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that State. Steven is the owner of American Security and American Investments.

38.     Defendant Stevenson and his companies, American Security and American Investments, operated as a sales agent of EquiAlt, distributing sales materials to solicit investment in EquiAlt. American Security, American Investments, and Stevenson processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their investments, including the reinvestment of funds. American Security, American Investments, and Stevenson were paid about $1.5 million for their solicitation efforts. Stevenson, American Security, and American Investments were involved in the sale of EquiAlt's securities to Webb, Tuggle, and the Alberts.

39.     Defendant Joseph LLC is a California limited liability company with its principal place of business in San Diego, California.

40.     Defendant Joseph Financial is a California corporation with its principal place of business in San Diego, California.

41.     Defendant Armijo is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that State. Armijo is the sole owner of Joseph LL and Joseph Financial.

42.     Armijo and his companies, Joseph Financial and Joseph LLC, operated as sales agents of EquiAlt, distributing sales materials to solicit investment in EquiAlt. Joseph Financial, Joseph LLC, and Armijo processed applications for investment in EquiAlt and engaged in

communication with investors regarding the status of their investments, including the reinvestment of funds. Joseph Financial, Joseph LLC, and Armijo were paid for their solicitation efforts. Joseph Financial, Joseph LLC, and Armijo were involved in the sale of EquiAlt's securities to Murphy.

43.     Defendant Allstate Financial is a Delaware corporation with its principal place of business in Lincoln, Nebraska.

44.     Defendant Anthony James Brown is, and was at all times mentioned herein, an individual citizen of the State of Florida, and currently resides in that State.

45.     Defendant Brown was affiliated with Allstate Financial until September 2019 as a personal financial representative. Brown and his affiliate, Allstate Financial, operated as a sales agent of EquiAlt, distributing sales materials to solicit investment in EquiAlt. Brown and Allstate Financial processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their investments, including the reinvestment of funds. Allstate Financial and Brown were paid for their solicitation efforts. Allstate Financial and Brown were involved in the sale of EquiAlt's securities to Corrasco.

46.     Defendant American Senior Benefits, LLC, is an Arizona limited liability company with its principal place of business in Scottsdale, Arizona.

47.     Defendant James Gray is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that State.

48.     Gray and his company, American Senior, operated as a sales agent of EquiAlt, distributing sales materials to solicit investment in EquiAlt. American Senior and Gray processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their investments, including the reinvestment of funds. American Senior and Gray

13

were paid for their solicitation efforts. American Senior and Gray were involved in the sale of EquiAlt's securities to Schoch.

49.     Defendant Andre Sears is, and was at all times mentioned herein, an individual citizen of Nevada, and currently resides in that State. Sears did business as the Picasso Group. At the same time, Sears was also affiliated with EquiAlt as its Vice President of Investor Relations.

50.     Defendant Maria Antonio-Sears is, and was at all times mentioned herein, an individual citizen of Nevada, and currently resides in that State. Antonio-Sears worked with Sears and the fictitious Picasso Group, where she held the title of Chief Operations Officer. At the same time, Antonio-Sears was also affiliated with EquiAlt and the Funds as an administrator. Antonio-Sears' signature appears on many of the documents concerning the purchase of EquiAlt Debentures.

51.     Sears, while doing business as Picasso Group, in collaboration with Antonio-Sears, operated sales agents of EquiAlt, distributed sales materials to solicit investment in EquiAlt. Sears and Antonio-Sears processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their investments, including the reinvestment of funds. Sears and Antonio-Sears were paid for their solicitation efforts. In their capacity as sales agents, Sears, Antonio-Sears, and Picasso Group were involved in the sale of EquiAlt's securities to the Gleinns and the Hannens.

52.     Defendant Elliott Financial Group, Inc. is an Arizona corporation with its principal place of business in Prescott, Arizona.

53.     Defendant Elliot Financial Advisors, LLC is an Arizona limited liability company with its principal place of business in Prescott, Arizona.

54.     Defendant Todd Regan Elliott is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that State.

55.     Elliott and his companies, Elliott Financial and Elliott LLC, operated as sales agents of EquiAlt, distributing sales materials to solicit investment in EquiAlt. Elliott, Elliott Financial, and Elliott LLC processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their investments, including the reinvestment of funds. Elliott, Elliott Financial, and Elliott LLC were paid for their solicitation efforts. Elliott, Elliott Financial, and Elliott LLC were involved in the sale of EquiAlt's securities to Kujawa.

56.     Defendant Wealth Protection Partners, Inc. is a California corporation with its principal place of business in Temecula, California.

57.     Defendant Yvette Papazian Spillman is, and was at all times mentioned here, an individual citizen of the State of California, and currently resides in that State.

58.     Spillman and her company, Wealth Protection, operated as sales agents of EquiAlt, distributing sales materials to solicit investment in EquiAlt. Spillman and Wealth Protection processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their investments, including the reinvestment of funds. Spillman and Wealth Protection were paid for their solicitation efforts. Spillman and Wealth Protection were involved in the sale of EquiAlt's securities to the Hoffsetters.

59.     Ben Mohr Inc. is a California corporation with its principal place of business in San Ramon, California.

60.     Ben Mohr LLC is a California limited liability company with its principal place of business in San Ramon, California.

61.    Benjamin Mohr is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that State.

62.    Mohr and his companies, Mohr Inc. and Mohr LLC, operated as sales agents of EquiAlt, distributing sales materials to solicit investment in EquiAlt. Mohr, Mohr Inc., and Mohr LLC processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their investments, including the reinvestment of funds. Mohr, Mohr Inc., and Mohr LLC were paid for their solicitation efforts. Mohr, Mohr Inc., and Mohr LLC were involved in the sale of EquiAlt's securities to Wong.

63.    On October 22, 2018, Benjamin Charles Mohr and Ben Mohr, Inc. were issued a Resist and Refrain Order from the State of California's Department of Business Oversight, Business, Consumer Services and Housing Agency, attached as **Exhibit E.** The Order states that "[b]eginning in at least 2017, BMI and Mohr offered, sold and effected transactions in securities in the form of investment agreement in EquiAlt Fund, LLC. (EquiAlt)," among other securities, yet "BMI and Mohr have never obtained a certificate to act as a broker-dealer under CSL section 25210 and is not exempt from the licensure requirement." *Id.* Based on these findings, the Commissioner of Business Oversight concluded:

> Ben Mohr, Inc. and Benjamin Charles Mohr are subject to the laws regulating broker-dealers under Corporate Securities Law of 1968, and has affected transactions in, or induced, or attempted to induce the purchase or sale of, securities as broker-dealers, without having first applied for and secured from the Commissioner a certificate authorizing these persons to act in that capacity, in violation of CSL section 25210.

> Pursuant to CSL section 25532, Ben Mohr, Inc. and Benjamin Charles Mohr are hereby ordered to desist and refrain from conducting business as a broker-dealer, unless and until certification has been made under said law or unless exempt.

> This Order is necessary, in the public interest, for the protection of investors and consistent with the purposes, policies and provisions of the Corporate Securities Law of 1968.

*Id.*

64.     Lifeline is a Wyoming corporation with its principal place of business in Walnut Creek, California.

65.     John Albino Marques is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that State. Marques is the President, Chief Executive Officer, and Senior Account Executive for Lifeline.

66.     Gregory Talbot is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that State. Talbot is the Vice President of Lifeline.

67.     Marques, Talbot, and their company, Lifeline operated as sales agents of EquiAlt, distributing sales materials to solicit investment in EquiAlt. Marques, Talbot, and Lifeline processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their investments, including the reinvestment of funds. Marques, Talbot, and Lifeline were paid for their solicitation efforts. Marques, Talbot, and Lifeline were involved in the sale of EquiAlt's securities to Mogensen.

68.     Financial Group is an Arizona limited liability company with its principal place of business in Phoenix, Arizona.

69.     Patrick J. Runninger is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that State. Runninger is a member of the Financial Group LLC.

70.     Runninger and his company, Financial Group, operated as sales agents of EquiAlt, distributing sales materials to solicit investment in EquiAlt. Runninger and Financial Group processed applications for investment in EquiAlt and engaged in communication with investors regarding the status of their investments, including the reinvestment of funds. Runninger and

Financial Group were paid for their solicitation efforts. Runninger and Financial Group were involved in the sale of EquiAlt's securities to the Benzes.

## GENERAL FACTUAL ALLEGATIONS

### A.  EquiAlt and its Offerings

71.     The EquiAlt Principals controlled EquiAlt, whose primary business was to directly, or indirectly, manage all of the day-to-day operations of the Funds including the solicitation of investors, and all of the Funds' accounting and financial activities. Davison formed EquiAlt in 2011 and has signature authority over the company's bank accounts. Rybicki managed EquiAlt's relationship with various unlicensed sales agents (acting as unregistered broker-dealers), including the Defendants, who sold the Funds' securities, communicated with investors, and was otherwise involved in raising money for the Fund.

72.     In marketing materials and through its website, EquiAlt claims to own a portfolio of revenue-generating condominiums and single and multi-family homes. EquiAlt also attracted investors using private placement memorandums, or "PPMs". Exemplars of these PPMs are attached as **Exhibit A.**  Meanwhile the PPMs for the Funds state that the investment objective of the Funds is to purchase and sell single-family properties in distressed real estate markets in the U.S. and participate in opportunistic lending in the U.S. In marketing materials provided to prospective investors, EquiAlt boasts that its programs or offerings "protect against market conditions" and are "not susceptible to interest rate hikes & lending trends." EquiAlt also claims to provide commercial lending investments to construction and development projects, "filling in the gaps left by local community banking systems."

73.     From January 2010 to November 2019, EquiAlt raised more than $170 Million from some 1,100 investors though the sale of fixed rate debentures issued by the Funds (the

"EquiAlt Debentures"). Of that total amount, $145 Million was raised from January 2015 through November 2019. These debentures are securities within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. EquiAlt continues to market and raise funds from investors.

74.     Defendants sold investors one type of security: 3-year or 4-year term debentures of the Funds providing a fixed annual return of 8 % to 10%. These EquiAlt Debentures[2] were never traded on any national exchange and are not otherwise "covered securities" under 15 U.S.C. § 78bb(f)(5)(E). Upon information and belief, the offering materials for the EquiAlt Debentures were prepared by the law firm of DLA Piper.  DLA Piper played an integral role in many of the relevant EquiAlt events, assured many of the consumers as to the validity of these investments and DLA Pipers' involvement played a large part in the decision of these plaintiffs to invest in these deals. Ongoing discovery will reveal the full extent that DLA Piper played in these events and whether they need to be added as a named defendant. Other law firms such as Fox Rothschild L.L.P.  also played a significant in many of these events and discovery will also reveal their full extent and participating in this Ponzi scheme.  In fact, DLA Piper previously touted to the public all about their involvement and major role in assisting many facets of work for EquiAlt, but has since removed these specific website announcements:

> DLA Piper advises EquiAlt on the formation and offering of its
> ...www.dlapiper.com › news › 2018/11 › dla-piper-advises-EquiAlt-on-q...
> Nov 15, 2018 - DLA Piper represented EquiAlt LLC, in the formation and offering of their recently formed EquiAlt Qualified Opportunity Zone Fund, LP that ...

> Paul Wassgren | People | DLA Piper Global Law Firmwww.dlapiper.com › people › wassgren-paul
> DLA Piper represented EquiAlt LLC, in the formation and offering of their recently formed EquiAlt Qualified Opportunity Zone Fund, LP that purchases and ...

---

[2] The EquiAlt Debentures are alleged in this action to be securities, subject to state and federal law, and as such are sometimes referred to in the complaint as "EquiAlt Securities".

https://www.leopardsolutions.com/hotspot/ListSummaryDetails.aspx?categoryid=
0&month=11&year=2018
DLA Piper advises EquiAlt on the formation and offering of its US$500 million
Qualified Opportunity Zone fund

DLA Piper - @DLA_Piper Twitter Profile | Twipuwww.twipu.com › DLA_piper
Explore @DLA_Piper Twitter Profile | DLA Piper, a global law firm operating
through ... We advised EquiAlt on the formation and offering of its US$500 million
...

Additionally, in a brochure created by EquiAlt concerning "Alternative Investment Strategies,"

DLA Piper LLP (US) is listed as the "Legal" service provider. *See* SEC Action, ECF No. 7-6 at

49.

75.     Many of the investors were elderly, retired and used IRAs to fund their investments

in the Funds. Furthermore, many of the investors were unaccredited or unsophisticated in that they

lacked knowledge and expertise in financial or business matters, were not capable of evaluating

the merits and risks of the investment, and were not otherwise capable of bearing the economic

risks of the investment. Many of the investors were attracted by representations that the

investments in the Funds were "secure," "safe," "low risk," and "conservative" and by assurances

that EquiAlt could not go bankrupt.

76.     EquiAlt also used in-house employees and unlicensed external sales agents such as

the Defendant Sales Agents to solicit investments from the general public through cold calling

campaigns, social media, websites, and in-person meetings. Although the PPM provided to many

investors stated that the Funds "may" pay commissions or fees to registered broker/dealers or other

financial intermediaries, the Funds always paid commissions of anywhere between 10%−14%.

This is another place where the PPMs were false and misleading. In fact, over a period of several

years the Funds have paid commissions (primarily to Rybicki or his company BR Support

Services, LLC) totaling approximately $24 million using investor money. Moreover, many of the

subscription agreements signed by Rybicki actually stated that the investments are being sold without commission.

77.     On February 18, 2020, the Securities and Exchange Commission announced an emergency enforcement action and a temporary restraining order and asset freeze against Florida-based private real estate firm EquiAlt LLC, its CEO Brian Davison, and its Managing Director Barry Rybicki, in connection with an alleged fraudulent unregistered securities offering that raised more than $170 million from at least 1,100 investors, a number of whom invested their retirement funds.  According to the SEC's complaint, unsealed on February 14, 2020 in the U.S. District Court for the Middle District of Florida, EquiAlt, Davison, Rybicki, and the entities they control, fraudulently raised millions of dollars by making material misrepresentations to investors about EquiAlt's investment strategy, the financial condition of the investments, and the uses of investor proceeds. The defendants allegedly told investors they would pool investor funds and use approximately 90% of the money to purchase under-valued real estate, rent or flip the properties, and pay investors 8-10% annual interest generated from the real estate investments. In reality, the complaint alleges, a large portion of investor money went to support Davison's and Rybicki's lavish personal spending, and less than 50% of the funds raised were used to invest in properties. In addition, money from one investment fund controlled by EquiAlt was allegedly used to make Ponzi-like payments to investors in another fund.  On February 14, 2020, a federal judge granted the SEC's request for emergency relief, including a temporary restraining order, an asset freeze, an order against the destruction of documents, and an accounting against EquiAlt, Davison, Rybicki and a number of companies charged by the SEC as relief defendants. The court also granted the SEC's request to appoint a receiver over the corporate defendants and the relief defendants.

**B.  Fraudulent Conduct**

**i.  EquiAlt is Conducting a Ponzi Scheme**

78.     The Funds have been operated as Ponzi scheme almost since their inception by paying investors their monthly interest payment for the unregistered securities by raising and using new investor funds to pay old investors. While Fund 3 is now closed, Fund 1, Fund 2, and the EA SIP Fund have collectively been raising from investors approximately $2–$3 million per month since January 2018.

79.     Notably, since the beginning of their operations, the Funds have suffered significant financial losses with monthly costs and expenses, including the interest owed to investors, greatly exceeding revenues generated from the Funds' business operations.

80.     Even if Fund 1, Fund 2, and the EA SIP were able to liquidate their real estate holdings at their values stated in their internal books and records, the Funds' combined assets would fall millions of dollars short of the amount owed to investors by December 2020.

81.     The EquiAlt Principals and Kelly knew that they were running a Ponzi scheme. For example, Kelly prepared one or more "point in time" spreadsheets for Davison. These spreadsheets reflected the numbers for the properties at a particular point in time. On one spreadsheet, for example, Kelly's report showed the EquiAlt properties' portfolio value, notes held and cash out numbers. *See* SEC Action, ECF No. 7–1 at 161–64 (Exhibit 3 to the SEC's deposition of Davison). It also held the rent roll, being the amount of rent coming in on any given month. *Id.* That spreadsheet showed almost $360,000 in total monthly revenue, and at that time, there was $104 million raised from investors. *Id.* Thus, at that point in time, the annual revenue was about $4,320,000 against $104 million of investor funds, meaning a gross return of just 4.1%, while investors were promised 8%, net of operating revenues and commissions. Thus, at that point in

time, Kelly and Davidson knew that there was not enough income to pay investors, meaning the only way they could pay investors was by raising new money from new investors. Kelly thus had actual knowledge of the Ponzi scheme based on the reports he personally prepared just by reviewing the revenues and the amounts owed to investors.

82.    The fact that EquiAlt was operated as a Ponzi scheme was gradually revealed by EquiAlt's dealing with professionals. For example, upon information and belief, Wells Fargo Bank had been performing banking functions EquiAlt for several years when, at some point, it sought a meeting with Davison to discuss EquiAlt's accounts. Instead of conducting that meeting, Davison abruptly transferred all of EquiAlt's business to Bank of America.

83.    Similarly, for many years, EquiAlt's accounting was performed by an outside accounting firm, Gino Mauriello & Co ("Gino"). At some point, Davison announced that all accounting was going to be performed in-house and an accountant from Gino came in to train a bookkeeper, Michelle Rodriguez, who lacked the requisite education and experience to perform proper financial controls. By early 2017, the workload was too much for Rodriguez and all association with Gino ended. Davison thereafter hired the Taylor White accounting firm to perform a search for a new in house accountant. This search led to the hiring of Denver Stoddart as EquiAlt's CPA, who remained a contract worker for Taylor White. Later still, EquiAlt expanded its in house accounting group by hiring Bud Williams from Taylor White as well as three other short-term people.

84.    Plaintiffs will conduct discovery regarding the banks and accounting firms involved in EquiAlt to understand their full extent and involvement in these activities.

**ii. Misappropriation of Investor Funds**

85.     The EquiAlt Principals have misappropriated millions of dollars from the Funds for their own personal benefit. In fact, between 2017 and 2018 Davison and Rybicki received improper cash distributions totaling more than $11 million from the Funds. And in 2019, Davison and Rybicki took improper cash distributions from the Funds of $6.1 million and $1.2 million, respectively, purportedly for the repayment of loans to the Funds. Kelly also received improper "commissions" while working at EquiAlt.

86.     The EquiAlt Principals often used this money to purchase high-end personal items such as luxury automobiles (such as Ferraris, Porsches and a Rolls Royce), watches, and to charter private jets. Davison alone spent more than $2.7 million on luxury automobiles and watches and chartering private jets. Davison, in April 2017, also took cash distributions from several of the Funds totaling $1.8 million and used the money to pay personal back income taxes owed to the Internal Revenue Service.

87.     In addition to these improper cash distributions, when visiting New York, Davison stayed on multiple occasions at one of the Funds' most expensive properties, a $2.7 million Manhattan condominium which has never generated any income for the Funds, despite having been purchased several years ago with investor money.

**iii. Misuse of Investor Funds**

88.     Instead of investing their funds as promised, the Defendants have misused millions of dollars in several distinct ways – all of which are inconsistent with the PPMs provided to investors.

89.     More specifically, the PPM for Fund 1, Fund 2, and the EA SIP Fund state that investor money would be used to purchase, own, improve and/or sell real property. In fact, the

PPM for each of these Funds included a detailed chart of "projected sources and uses of cash." The chart, however, identified only the following six specific uses of that cash: investments in property, accounting and tax preparation, legal costs, investor relations and communications expenses, marketing and sponsorship event fees, and miscellaneous expenses and reserves. While the PPM for these Funds state that "All uses of proceeds are estimated and subject to change," only the above six specific uses of investor proceeds are delineated in the document.

90.     Despite the restrictions of use contained in the PPMs, EquiAlt misused investor funds in several ways, including (a) money from one Fund being used to purchase real estate for another Fund or for third party entities owned by Davison; (b) money from one Fund being used to pay investors in another Fund; (c) substantial undisclosed commissions paid to unregistered sales agents, including Defendants; (d) substantial undisclosed fees such as due diligence fees, management fees, success fees, auction fees, underwriting fees, purchase discount fees, and bonuses paid to EquiAlt and Davison; and (e) substantial improper cash distributions to Davison and Rybicki. The misuse of investor funds was not an isolated event but rather was continuous over a period of several years and totaled millions of dollars.

91.     For example, sometimes contractors would be asked to prepare invoices for extra work on a real estate property owned by EquiAlt that was not actually performed. These invoices were used to paper over the fraud. In another instance, two insiders at EquiAlt were terminated after reporting to Davison that they were seeing strange things, such as the sale of real estate property by one Fund and then repurchase of that same real estate property by another Fund at a higher price.

### C.  Misrepresentations and Omissions to Investors

92.     EquiAlt, the EquiAlt Control Persons, and the Defendants have misrepresented to investors how their money would be used by the Funds. For example, the PPMs for Fund 1, Fund 2, and the EA SIP Fund indicate that approximately 90% of investor funds would be used to "invest in property." Yet, less than 50% of investor funds were actually used for that purpose. Indeed, a substantial part of the remaining funds was used for improper purposes such as the payment of millions of dollars in fees and bonuses to EquiAlt and others. None of these other fees were described in the offering documents or marketing materials sent to investors.

93.     As alleged above, PPMs for Fund 1, Fund 2, and the EA SIP Fund disclosed a list of specific uses of investor funds. This list, however, did not disclose that the Funds would use investor money to pay EquiAlt extraneous fees described above totaling millions of dollars. For example, although not disclosed to investors, the Funds paid EquiAlt a so-called "discount fee" or the difference in the listed sales price for a particular property and the ultimate purchase priced paid by the Fund to acquire such property. Instead of benefiting from a lower ultimate sales price for the property, the Funds paid the actual cost savings to EquiAlt as a discount fee. No aspect of this fee was ever disclosed to investors who were already paying substantial management and other fees to EquiAlt supposedly to manage the Funds.

94.     EquiAlt and the Defendants also failed to disclose to investors that more than $6.61 million of investor money would be transferred between the Funds with the money raised by one Fund being used to pay the debts and obligations of another Fund. For example, in December 2015, Fund 1 and Fund 2 transferred, respectively $1.29 million and $1.08 million to Fund 3, which Fund 3 used to pay approximately $2.3 million in principal and interest to its investors. Fund 3 could not have made these payments without the cash infusion from Funds 1 and 2.

95.     EquiAlt and the Defendants also failed to adequately disclose to investors that their funds would be used to pay commissions to unlicensed third party sales agents. First, many of the subscription agreements signed by Rybicki stated that investments in the Funds were being sold without the payment of a commission. Furthermore, while the PPMs provided to investors stated that the Funds "may" pay commissions to sales agents, in reality commissions were *always* paid in connection with the sale of the Funds' investments. In addition, in many cases investors never received the PPM and were not informed about any commission being paid in connection with their investment.

96.     According to the SEC, Ronald Stevenson and his company raised about $15,180,000 from many investors, and was paid $1.5 million in commissions by EquiAlt. This means that EquiAlt was paying approximately 10% in commissions to sell EquiAlt investments, much higher than industry averages for the sale of investments and a red flag for any investment advisor.

97.     Investors were also misled about the payment of management fees to EquiAlt. Although EquiAlt collected substantial management fees from the Funds, many investors were expressly told that no management fees would be paid to EquiAlt. For example, EquiAlt's President of Business Development and Marketing stated to Fund 2 investors in writing that EquiAlt had no management fees.

98.     Moreover, although the PPMs for all the Funds state that "the Manager will receive Management Fees as set forth in the Operating Agreement and as described more fully below," there is no description elsewhere in the PPMs (or in the Operating Agreements, which were not sent to investors) of what or how the management fees would be paid. Nowhere in the offering materials is there any disclosure to investors that EquiAlt and Davison would receive more than

$6.67 million in "management fees" from the Funds or of the millions of dollars in other fees described above.

99.    Defendants failed to disclose that they were not properly licensed to sell EquiAlt securities in violation of state and federal law. Defendants were required to be registered in the state from which they were soliciting sales, and in every state where a purchaser resided, but none of the Defendants were registered.

100.    Defendants failed to disclose that the transactions were illegal because they involved the sale of unregistered securities, not exempt under state and federal law.

101.    Defendants failed to disclose that they had not performed adequate due diligence that would have revealed that EquiAlt was insolvent on an income-expense analyses, i.e., EquiAlt was not generating enough income to pay the promised returns to investors.

102.    Defendants failed to disclose that EquiAlt was a Ponzi Scheme, which they should have discovered had they performed adequate due diligence.

103.    Defendants failed to disclose that EquiAlt was not registered as a broker-dealer qualified to sell investments from the State of Florida;

104.    Defendants failed to disclose that had they conducted adequate due diligence, they would have discovered that the two principals, Rybicki and Davison, were taking out such large distributions or commissions, that EquiAlt would never be able to pay back investors in full.

**ii.    False Statements About Risk**

105.    Investors were misled about the safety and risk of their investments. While pitching investments in the Funds, EquiAlt and the Defendants represented that the investments were "low risk," "safe, and "conservative." Investors were even told that the Funds had "never lost investor dollars since inception." The investments, however, were anything but low risk, safe or

conservative. In fact, the Funds have suffered substantial financial losses since their inception. Furthermore, Davison and Rybicki have depleted the Funds' assets through a years-long scheme involving outright misappropriation and misuse of investor funds.

106.    Defendants uniformly described the investment to investors as a safe or secure form of generating an income for the investor, because there was real estate to collateralize their investment. In fact, there was only $55 million of real estate that backed approximately $171 million of investor money, according to the SEC.

### iii.    False Statements About Registration with the Commission and Compliance with Applicable Laws

107.    EquiAlt falsely told investors in at least one Fund (Fund 2) it was registered with the Commission since 2009. In truth, neither EquiAlt nor the Funds have ever been registered with the Commission in any capacity.

108.    Written sales materials provided to investors also stated that "payments to licensed brokers and/or finders may be made in compliance with applicable federal and state securities laws." In reality, during a period of several years the Funds and BR Support Services, LLC paid commissions totaling millions of dollars to unlicensed sales agents deployed by EquiAlt to market and promote the Funds' investments, including payments to the Defendants.

### iv.    False Statements About Fund Management

109.    Investors were even misled about the persons involved in managing the Funds. At least two different versions of the PPM for Fund 1 and Fund 2 identified an individual referred to herein as "DD" as a CPA with an MBA degree who was serving as EquiAlt's Chief Financial Officer. The description of DD's professional background highlighted DD's prior experience at a Big-Four accounting firm, with SEC reporting requirements, as a CFO of a $100 million real estate mortgage and title company, and as an author. However, DD has never worked as EquiAlt's CFO.

**D.  The EquiAlt Debentures Were Required to Be Registered**

110.    The EquiAlt debentures constitute "securities" that cannot be offered or sold without registration under federal and state blue sky laws.

111.    Section 517.07, Florida Statutes, prohibits any person to sell or offer to sell a security within Florida unless the security is exempt under section 517.051, is sold in a transaction exempt under section 517.061, is a federal covered security, or is registered pursuant to Florida Statute. Section 517.211, Florida Statutes, affords a statutory cause of action to victimized investors for violation of Section 517.07.

112.    Arizona Revised Statues § 44-1841 prohibits the offer for sale or sale within or from Arizona of any securities unless the securities have been registered pursuant Arizona statute, or are federal covered securities. Arizona Revised Statutes § 44-2001 affords a statutory cause of action to victimized investors for violations of Section 44-1841. Finally, Arizona Revised Statutes 44-2003 provides that an action brought under section 44-2001 may be brought against any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale or purchase, and such persons shall be jointly and severally liable to the person who is entitled to maintain such action, provided that no person shall be deemed to have participated in any sale or purchase solely by reason of having acted in the ordinary course of that person's professional capacity in connection with that sale or purchase.

113.    California Corp. Code § 25110 prohibits the offer or sale by any person in California of securities that are not qualified through registration. California Corp. Code § 25503 affords a statutory cause of action to victimized investors for violations of Section 25110. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who

materially assists in a violation of Section 25110 with an intent to deceive or defraud is jointly and severally liable with any other person liable under Section 25503.

114.     Nevada Statute § 90.460 prohibits the sale of any security in that State unless the security is registered or the security is exempt from registration. Nevada Statute § 90.310 prohibits the offer or sale of securities by any person in Nevada unless they are licenses or exempt from licensing.  Nevada Statute § 90.660 affords statutory causes of action to victimized investors for violations of Sections 90.460 and 90.310.

115.     The EquiAlt Debentures were not properly registered or qualified for offer or sale either with any federal or state regulator. The EquiAlt Debentures were unlawfully offered for sale and sold as unregistered securities under federal and state blue sky laws.

116.     The EquiAlt Debentures state that they are securities which are exempt from registration. According the Form Ds EquiAlt and/or the Funds filed with the SEC, the EquiAlt Debentures were claimed to be exempt from registration pursuant to Rule 506(b) of Regulation D, which is considered a "safe harbor" under Section 4(a)(2) of the Securities Act.

117.     First, the EquiAlt Debentures were not exempt from registration under Rule 506(b) because, upon information and belief, they were sold to more than 35 non-accredited investors.

118.     Second, the EquiAlt Debentures were not exempt from registration under Rule 506(b) because they were marketed to the public through general solicitations and advertising and sold to non-accredited investors. An exemplar of EquiAlt's general solicitation and advertising is attached as **Exhibit B.**

119.     Third, EquiAlt and the Funds failed to disclose in their Form D their compensation arrangements and personal use of funds, as described above. These failures to disclose constitute additional violations of Rule 506(b) of Regulation D.

31

### E.  Plaintiffs' Individual Experiences

### i.  The Rubinsteins

120.    The Rubinsteins were introduced to EquiAlt by the Family Tree Defendants, who advised that investing in their debentures was a safe way to earn a high rate of return on their money with minimal risk. Specifically, Defendant LaDuca introduced the Rubinsteins to EquiAlt and told them that they had done their due diligence and it was a good investment. Indeed, LaDuca stated he was so confident in the investment that the principal of Family Tree, Wooten, had his mother invest in EquiAlt.

121.    On January 31, 2020, the Rubinsteins purchased a $75,000 investment with Fund 2, at an annual rate of 8.00%, with a 48-month term. Payments were to be made monthly beginning in March 2020. A copy of the Rubinstein Investment Documents, which are materially similar to the documents executed by all other EquiAlt investors, are attached as **Exhibit C.** These documents are signed by both Steven J. Rubinstein and Tracey F. Rubinstein, on behalf of the Trust, and Barry M. Rybicki, on behalf of Fund 2.

122.    The Form of Debenture prominently states:

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE, AND IS ISSUED IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR RE-SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS.

*Id.* This disclaimer was included in all of the EquiAlt Debentures.

123.     The Rubinsteins were also required to fill out a Prospective Purchaser Questionnaire. *Id.* The Rubinsteins disclosed that they were not an "Accredited Investor," but that they have a net worth of approximately $2 million and approximately $150,000 of income in 2019, with a reasonable expectation of earning an annual income of approximately $150,000 the following year.

**ii.     Toone**

124.     Plaintiff Toone was introduced to EquiAlt by Family Tree, Wooten, and LaDuca, who advised that investing in their debentures was a safe way to earn a high rate of return on their money with minimal risk.

125.     On April 9, 2019, Plaintiff Toone purchased a $60,000 investment with Fund 1, at an annual rate of 8.00%, with a 48-month term. Payments were to be made monthly beginning in May 2019. Additionally, on April 26, 2019, Toone purchased a $30,000 investment with Fund 2, at an annual rate of 8.00%, with a 48-month term. These documents are signed by both Toone and Rybicki, on behalf of Fund 1.

126.     Toone was also required to fill out a Prospective Purchaser Questionnaire with respect to each purchase. Regarding the first purchase, Plaintiffs disclosed that he was not an "Accredited Investor," but that he has a net worth of approximately $400,000 and approximately $65,000 of income in 2018, with a reasonable expectation of earning an annual income of approximately $65,000 the following year. Regarding the second purchase, Plaintiffs disclosed that he was not an "Accredited Investor," but that he has a net worth of approximately $500,000 and that he had a reasonable expectation of earning an annual income of approximately $50,000 in 2019.

### iii.    Webb

127.    Webb was introduced to EquiAlt by Stevenson, who advised that investing in EquiAlt's debentures was a safe way to earn a high rate of return on his money with minimal risk.

128.    Over the course of several years, Stevenson, American Security and American Investments persuaded Webb to make a series of investments in EquiAlt, through Webb's IRA and individually. Webb purchased a $239,600 EquiAlt Debenture for the benefit of the Webb IRA on September 8, 2017 through Fund 1. Webb made purchased an additional $250,000 EquiAlt Debenture for the Webb IRA on May 18, 2018. Webb purchased also made the following purchases of EquiAlt Debentures on an individual basis: a $100,000 purchase on January 19, 2016; a $100,000 purchase on April 30, 2018; a $100,000 purchase on July 11, 2018; and a $100,000 purchase on August 15, 2018.

### iv.    Tuggle

129.    Tuggle was also introduced to EquiAlt by Stevenson, who advised that investing in EquiAlt's Debentures was a safe way to earn a high rate of return on his money with minimal risk.

130.    Tuggle purchased three EquiAlt Debentures. Tuggle purchased a $25,000 EquiAlt Debenture on June 19, 2017, in Fund 2; purchased a $20,000 EquiAlt Debenture on April 3, 2018, in EA SIP Fund; and purchased a $25,000 EquiAlt Debenture on April 30, 2018, in Fund 1.

### v.    The Alberts

131.    The Alberts were introduced to EquiAlt by Stevenson through his wife, Barbara, who is a tax preparer. After Barbara prepared the Alberts' taxes following their move to Arizona in 2016, she introduced them to Stevenson, who suggested they invest in EquiAlt Debentures because it was a safe way to earn a high rate of return on his money with minimal risk.

132.    The Alberts purchased their first EquiAlt Debenture on March 27, 2018 for $100,000, with a 36-month term, and an 8.00% interest rate.

133.    The Alberts purchased their second EquiAlt Debenture on June 25, 2018 for $35,000, with a 48-month term, at an 8.00% interest rate.

134.    Hans Albert purchased an EquiAlt Debenture for the benefit of the Albert IRA on March 14, 2019 for $90,420.81, with a 48-month term, and an 8.00% interest rate.

### vi.    Murphy

135.    Plaintiff Murphy was introduced to EquiAlt by Armijo, who advised that investing in its debentures was a safe way to earn a high rate of return on her money with minimal risk.

136.    On December 1, 2016, Plaintiff Murphy purchased a $250,000 investment with Fund 1, at an annual rate of 10.00%, with a 36-month term. Payments were to be made monthly beginning January 1, 2017. These documents are signed by both Murphy and Rybicki, on behalf of Fund 1.

137.    Murphy was also required to fill out a Prospective Purchaser Questionnaire. *Id.* Murphy certified that she was an accredit investor because she is an individual whose individual net worth, or joint net worth with her spouse, presently exceeded $1,000,000.

138.    On January 30, 2018, Murphy liquidated $100,000 of her initial $250,000 investment and executed a transfer of funds, authorizing transfer of her investment in the amount of $150,000 from Fund 1 to EA SIP Fund.

139.    On December 1, 2019, Murphy's investment came up for renewal. Armijo emailed Murphy on December 11, 2019 asking her if she would like him to process the renewal paperwork. In response, Murphy indicated that she would like to take her funds back in full.

140.     On January 8, 2020, EquiAlt sent Murphy a letter regarding "Wind down of EquiAlt Fund LLC," in which it stated that EquiAlt would be closing Fund 1 and to "begin the shift of activities to facilitating the sale of the fund's assets to repay all investor principle starting in Q1 2020." *See* **Exhibit D**. The letter, which was sent to other plaintiffs as well, contained many misrepresentations about Fund 1, including:

    a.   "We are pleased that the Funds has been successful and has achieved its goals."

    b.   "Management estimates that the Fund is solvent as a stand-alone entities" and "the value of the assets exceeds the liabilities against the fund."

*Id.* The letter concluded by explaining that Fund 1 would be wound down over a period of 18 months. As of the date of this complaint, Murphy has not been re-paid her $150,000 investment. *Id.*

### vii.     Hammon

141.     Hammon was introduced to EquiAlt and the EquiAlt Debentures by Wooten of Family Tree, who advised that investing in its debentures was a safe way to earn a high rate of return on her money with minimal risk. Wooten acted as the intermediary between EquiAlt and the Funds and Hammon.

142.     On October 24, 2017, Plaintiff Murphy purchased two EquiAlt Debentures: one for the Hammon IRA, and one individually.

143.     The first EquiAlt Debenture Hammon purchased for the Hammon IRA made a $655,101.78 investment with Fund 1, at an annual rate of 8.00%, with a 48-month term. Payments were to be made monthly beginning December 2017.

144.     The second EquiAlt Debenture Hammon purchased individually made a $300,000 investment with Fund 1, at an annual rate of 8.00%, with a 48-month term. Payments were to be

made monthly beginning December 10, 2017. Wooten put Hammon under the impression that these funds would be placed into trust, however the documents were signed by Hammon individually and Hammon does not possess any documentation that the trust was actually created. Should these funds have been placed into a trust in his name, Hammon asserts these claims as trustee of that trust.

### viii.  Corrasco

145.    Corrasco was introduced to EquiAlt and the EquiAlt Debentures by Brown of Allstate Financial, who advised that investing in its debentures was a safe way to earn a high rate of return on her money with minimal risk. Brown acted as the intermediary between EquiAlt and the Funds and Corrasco.

146.    On July 23, 2019, Plaintiff Corrasco purchased an EquiAlt Debentures for the benefit of the Corrasco Traditional IRA.

147.    The EquiAlt Debenture Corrasco purchased for the Corrasco Traditional IRA made a $200,000 investment with Fund 1, at an annual rate of 8.00%, with a 48-month term.

### ix.  Schoch

148.    Schoch was introduced to EquiAlt and the EquiAlt Debentures by Gray of American Senior Benefits, who advised that investing in its debentures was a safe way to earn a high rate of return on her money with minimal risk. Gray acted as the intermediary between EquiAlt and the Funds and Schoch.

149.    On July 1, 2019, Plaintiff Schoch purchased an EquiAlt Debentures for the benefit of the Schoch Traditional IRA. The EquiAlt Debenture Schoch purchased for the Schoch Traditional IRA made a $110,000 investment at an annual rate of 8.00%, with a 36-month term.

### x.  Smith

150.    Smith was introduced to EquiAlt and the EquiAlt Debentures by Mason of Family Tree, who advised that investing in its debentures was a safe way to earn a high rate of return on her money with minimal risk. Mason and Wooten acted as the intermediaries between EquiAlt and the Funds and Smith.

151.    On May 6, 2019, Smith purchased a $60,738.65 EquiAlt Debenture with Fund 2, at an annual rate of 8.00%, with a 48-month term, for the benefit of the Smith IRA.

**xi.    The Gleinns**

152.    Richard and Phyllis Gleinn are spouses who together were introduced to EquiAlt and the EquiAlt Debentures by Sears, who advised that investing in its debentures was a safe way to earn a high rate of return on her money with minimal risk. Sears acted as the intermediary between EquiAlt and the Funds and the Gleinns.

153.    On May 13, 2016, the Gleinns purchased their first EquiAlt Debenture, making a $50,000 investment with Fund 2, at an annual rate of 9.00%, with a 36-month term. At the end of the 36-month term, the Gleinns renewed this investment by purchasing a $50,000 EquiAlt Debenture with Fund 2 on April 25, 2019, at an annual rate of 9.00% and with a 36-month term. On May 1, 2019, the Gleinns purchased another EquiAlt Debenture, making a $200,000 investment with Fund 2, at an annual rate of 9.00%, with a 36-month term. These documents are signed by both Maria Antonio-Sears as the Fund 2 Administrative Manager.

154.    The Gleinns were also required to fill out a Prospective Purchaser Questionnaire with respect to each purchase. Regarding the first purchase, the Gleinns disclosed that they were not an "Accredited Investor," but that they had a net worth of approximately $750,000 and approximately $150,000 of income in 2015, with a reasonable expectation of earning an annual income of approximately $150,000 the following year. Upon renewal of the $50,000 investment

and the purchase of the $150,000 investment, the Gleinns filled out a Prospect Purchaser Questionnaire where they indicated that they were an accredited investor.

### xii.    The Hannens

155.    Bruce and Geraldine Mary Hannen are spouses who were introduced to EquiAlt and the EquiAlt Debentures by Sears, who advised that investing in its debentures was a safe way to earn a high rate of return on her money with minimal risk. Sears acted as the intermediary between EquiAlt and the Funds and the Gleinns.

156.    On July 26, 2016, the Hannens purchased their first EquiAlt Debenture, making a $200,000 investment with Fund 2, at an annual rate of 9.25%, with a 36-month term. On July 13, 2019, and at the end of the 36-month term, the Hannens renewed their EquiAlt investment, purchasing an EquiAlt Debentures for $200,000 with Fund 2, at an annual rate of 9.00%, with a 36-month term.

### xiii.    Kujawa

157.    Dennis and Marjorie Kujawa were spouses who were introduced to EquiAlt and the EquiAlt Debentures by Elliott, who advised that investing in its debentures was a safe way to earn a high rate of return on her money with minimal risk. Elliott acted as the intermediary between EquiAlt and the Funds and the Kujawas.

158.    Dennis Kujawa purchased six EquiAlt Debentures with Fund 1. Dennis Kujawa passed away on February 12, 2020. After his death, his wife Marjorie became the beneficiary of his Estate, inheriting the EquiAlt Debentures. Marjorie Kujawa accordingly is the beneficial owner of the following EquiAlt Debentures purchased by her husband Dennis Kujawa:

   a.    A $25,000 EquiAlt Debenture purchased on April 11, 2017 with Fund 1, at an annual rate of 8.00%, with a 48-month term;

   b. A $75,000 EquiAlt Debenture purchased on July 22, 2017 with Fund 1, at an annual rate of 8.00%, with a 48-month term;

   c. A $100,000 EquiAlt Debenture purchased on August 25, 2018 with Fund 1, at an annual rate of 8.00%, with a 48-month term;

   d. A $50,000 EquiAlt Debenture purchased on March 9, 2018 with Fund 1, at an annual rate of 8.00%, with a 48-month term;

   e. A $50,000 EquiAlt Debenture purchased on February 15, 2019 with Fund 1, at an annual rate of 8.00%, with a 48-month term;

   f. A $100,000 EquiAlt Debenture purchased on September 26, 2019 with Fund 1, at an annual rate of 8.00%, with a 48-month term.

### xiv. The Hoffsetters

159. The Hoffsetters were introduced to EquiAlt and the EquiAlt Debentures by Spillman, who advised that investing in its debentures was a safe way to earn a high rate of return on her money with minimal risk. Spillman acted as the intermediary between EquiAlt and the Funds and the Hoffsetters and the Hoffsetter Trust.

160. On March 20, 2019, the Hoffsetter Trust purchased a $100,000 EquiAlt Debenture, with a 12-month term, and an annual rate of 7.00%.

### xv. Wong

161. Wong was introduced to EquiAlt and the EquiAlt Debentures by Mohr, who advised that investing in its debentures was a safe way to earn a high rate of return on her money with minimal risk. Mohr acted as the intermediary between EquiAlt and the Funds and Wong.

162. On January 9, 2017, Wong purchased a $25,000 EquiAlt Debenture, with a 36-month term, and an annual rate of 10.00%.

163.     Wong was required to fill out a Prospective Purchaser Questionnaire with respect to her purchase. Wong disclosed that she was not an "Accredited Investor," but that she had a net worth of approximately $100,000 and approximately $100,000 of income in 2015, with a reasonable expectation of earning an annual income of approximately $100,000 the following year.

### xvi.     Mogensen

164.     Mogensen was introduced to EquiAlt by Marques and Talbot of Lifeline, who advised that investing in its debentures was a safe way to earn a high rate of return on her money with minimal risk. Marques and Talbot acted as the intermediaries between EquiAlt and the Funds and Mogensen.

165.     On September 28, 2019, Mogensen purchased a $70,000 EquiAlt Debenture, with a 48-month term, and an annual rate of 10.00%.

### xvii.    The Benzes

166.     The Benzes were introduced to EquiAlt by Runninger of Financial Group, who advised that investing in EquiAlt's Debentures was a safe way to earn a high rate of return on their money with minimal risk. Runninger and Financial Group acted as the intermediaries between EquiAlt and the Funds and the Benzes.

167.     On July 19, 2019, the Benzes purchased a $75,000.00 EquiAlt Debenture, with a 48-month term, and an annual rate of 8.00%.

168.     On July 22, 2019, Shirley Benz purchased a $278,103.00 EquiAlt Debenture, with a 48-month term, and an annual rate of 8.00%, for the benefit of the S. Benz IRA.

169.     On or about July 22, 2019, Charles Benz purchased a $289,898.19 EquiAlt Debenture for the benefit of the C. Benz IRA.

**F. Application of the Discovery Rule and the Fraudulent Concealment Doctrine.**

170.    EquiAlt and Defendants continued to actively solicit investors through false assurances of EquiAlt and the Funds' financial stability contained in a constant stream oral and written communications to investors and prospective investors from 2016 through January 2020. Because of the continuous positive assurances concerning the financial vitality of EquiAlt and the Funds, investors continued to pour money into EquiAlt even until a few weeks prior the SEC filed the SEC Action on February 11, 2020.

171.    The money continued to flow into early 2020 because the investors had no inkling of the securities violations, of the financial insolvency of the Funds, or of the Ponzi scheme they had become. Nor did they have any reason to suspect wrongdoing by anyone had caused them injury, as opposed to general market conditions.

172.     Furthermore, EquiAlt and the Defendants owing the investors fiduciary duties of truthfulness and full disclosure continued to feed them assurances through a series of investor reports designed to prevent them from suspecting any wrongdoing.

173.    In January 2020, for example, EquiAlt sent the letter concerning the winding down of Fund 1, described above. *See* Ex. E. This letter falsely represented that Fund 1 was solvent and achieving its goals and that investors would be paid back when, in truth, the fund was insolvent. Upon information and belief, similar representations were made to investors from time to time to convince them to keep their money invested with EquiAlt. Defendants were involved in providing Plaintiffs with such communications from EquiAlt.

174.    Plaintiffs and the Classes aver that, based on the false and misleading information fed to them, and the material information concealed from them by EquiAlt and Defendants, under Arizona's, California's, Florida's, and/or  Nevada's discovery rule they did not discover and did

42

not have reason to discover their causes of action relating to the EquiAlt Ponzi Scheme until February 11, 2020, at the earliest.  Prior to that date, Plaintiffs and the other investors did not have a reasonable factual basis to suspect that they had been harmed through any breach of fiduciary duty, fraud, or violations of Arizona's, California's, Florida's, or Nevada's securities laws.

175.    Alternatively, under Arizona's, California's, Florida's, and/or Nevada's fraudulent concealment doctrine, the limitations period was likewise tolled at least through February 11, 2020, based on the active deceptive conduct of EquiAlt and Defendants in concealing the Plaintiffs' causes of action.

## TENDER

176.    Conditioned upon the receipt of the rescissionary relief afforded under the Florida Securities and Investor Protection Act ("FSIPA"), the Arizona Securities Act, the California Securities Act, and the Nevada Securities Act, Plaintiffs tender their EquiAlt Debentures to Defendants.

## CLASS ALLEGATIONS

177.    Plaintiffs brings their claims on behalf of themselves and the following plaintiff Nationwide and state classes:

> **The Nationwide Class**: All persons who purchased an EquiAlt Debenture issued by any of the EquiAlt Funds, whether new or by reinvestment, that have not been fully repaid their principal investment.

> **The Arizona Class**: All persons residing in the State of Arizona who purchased an EquiAlt Debenture issued by any of the EquiAlt Funds, whether new or by reinvestment, that have not been fully repaid their principal investment.

> **The California Class**: All persons residing in the State of California who purchased an EquiAlt debenture issued by any of the EquiAlt Funds, whether new or by reinvestment, that have not been fully repaid their principal investment.

**The Florida Class**: All persons residing in the State of Florida who purchased an EquiAlt debenture issued by any of the EquiAlt Funds, whether new or by reinvestment, that have not been fully repaid their principal investment.

**The Nevada Class**: All persons residing in the State of Nevada who purchased an EquiAlt debenture issued by any of the EquiAlt Funds, whether new or by reinvestment, that have not been fully repaid their principal investment.

(collectively, "the Classes"). Excluded from the Classes are Defendants and their officers, directors and employees.

178.    Certification of the Class is appropriate and warranted under Federal Rule of Civil Procedure 23.

179.    The members of the Class are so numerous that separate joinder of each member is impracticable, especially given the SEC has estimated over 1,100 persons have purchased EquiAlt's unregistered securities, many of them Florida, Arizona, California, and Nevada residents. Moreover, upon information and belief, the Sales Agents each sold EquiAlt's unregistered securities to, at minimum, dozens of individuals. Although the number of Class members and their names are presently unknown, this information can be readily determined from EquiAlt's records.

180.    Plaintiffs' contentions raise predominately questions of law or fact common to each member of the Class. These common legal and factual questions include, but are not limited to, the following:

(A)    whether the Defendants violated the FSIPA;

(B)    whether the Defendants violated the Arizona Securities Act;

(C)    whether the Defendants violated the California Securities Act;

(D)    whether the Defendants violated the Nevada Securities Act;

(E)    whether the EquiAlt Debentures were exempt from registration;

(F)     whether the Defendants are "statutory sellers" liable for the offer and sale of unregistered securities;

(G)     whether the Defendants are "control persons" of EquiAlt and/or the Funds;

(H)     whether the Defendants engaged in negligent misrepresentations concerning EquiAlt and the EquiAlt Debentures;

(I)     whether statements made by Defendants to investors in the PPMs misrepresented material facts about the business and operations of EquiAlt and the Funds;

(J)     whether Defendants breached their fiduciary duties to Plaintiffs and the Classes;

(K)     whether Defendants aided and abetted breaches of fiduciary duty;

(L)     whether Plaintiff and Class members are entitled to recessionary relief, damages or other forms of relief available under FSIPA, the Arizona Securities Act, the California Securities Act, and/or the Nevada Securities Act;

(M)     whether Plaintiff and Class members are entitled to other equitable relief.

181.    Plaintiffs' claims are typical of the claim of each member of the Class, because, *inter alia*, all Class members were injured through the misconduct alleged herein. Plaintiffs are advancing the same claim and legal theories on behalf of themselves and all members of the Class.

182.    Plaintiffs will fairly and adequately protect and represent the interests of each member of the Classes. Plaintiffs are willing and prepared to serve the Court and the Classes in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes.

183.    The questions of law or fact common to the claim of each member of the Classes predominate over any question of law or fact affecting only individual members of the Classes.

184.    Finally, class representation is superior to other available methods for the fair and efficient adjudication of the controversy. In particular,

(A)    there is little economic incentive or other interest of Class members to individually prosecute separate claims,

(B)    Plaintiffs are unaware of any other pending litigation to which any member of the Classes is a party and in which any question of law or fact controverted in the subject action is to be adjudicated,

(C)    it is certainly desirable to concentrate this securities registration litigation in EquiAlt's home forum, where a receiver has been appointed, and

(D)    there appear no difficulties likely to be encountered in the management of the claim or defense on behalf of the Class.

Judicial determination of the common legal and factual issues essential to this case would thus be far more efficient and economical as a class action than in piecemeal individual determinations.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Florida Statutory Securities Fraud, § 517.301, Fla. Stat.
### Against All Defendants

185.    Plaintiffs repeat and re-alleges each and every allegation contained in Paragraphs 1 through 195 as if fully set forth  herein.

186.     This is an action against all Defendants, nationwide, who sold the EquiAlt securities, to any investor, in any state.

187.    FSIPA applies because there is a territorial nexus to the State of Florida.

Specifically, EquiAlt was the seller/issuer of the securities, which operated in Tampa, Florida, and sold its securities from Florida via its agents who operated both in Florida, and outside of Florida. Florida has a bonafide interest in eliminating a base of fraudulent operations located within its borders.

188.    Defendants' conduct constitutes a violation of section 517.301, Florida Statutes. Specifically, the EquiAlt Debentures purchased by Plaintiffs from EquiAlt and sold by Defendants constitute securities under section 517.021(21), Florida Statutes, and EquiAlt's receipt of payment for the Debentures for such EquiAlt securities constitutes a sale of securities under Chapter 517, Florida Statutes.

189.    Defendants made false statements and omissions of material facts to Plaintiffs in connection with Plaintiffs' payment for the EquiAlt securities. Those misstatements and omissions of material fact are common to the class.

190.    Plaintiffs justifiably relied on Defendants' uniform false statements and uniform omissions of material facts in connection with Plaintiffs payment for the EquiAlt securities, because the statements and omissions were material to the sale of EquiAlt securities.

191.    Defendants' false statements and omissions of material facts to Plaintiffs were intentional, or made with reckless disregard as to the truth of such statements.

192.    Plaintiff suffered damages as a direct result of Defendants' false statements and omissions of material facts.

193.    Defendants are jointly and severally liable for the damages suffered by Plaintiff for Defendants' violations of Section 517.301, Fla. Stat., which states in relevant part:

517.301   Fraudulent transactions; falsification or concealment of facts.—
(1)    It is unlawful and a violation of the provisions of this chapter for a person:

(a)   In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly:

1.   To employ any device, scheme, or artifice to defraud;

2.   To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

3.   To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

(b)   To publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, communication, or broadcast which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received directly or indirectly from an issuer, underwriter, or dealer, or from an agent or employee of an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount of the consideration.

194.   Defendants are jointly and severally liable for the damages suffered by Plaintiff under Florida Statute 517.211(2), which states in part:

Remedies available in cases of unlawful sale.— *(2)   Any person purchasing or selling a security in violation of s. 517.301, and every* director, officer, partner, or *agent of* or for *the* purchaser or *seller, if the* director, officer, partner, or *agent has personally participated or aided in making the sale or purchase*, *is jointly and severally liable to the person* selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or *for damages, if the plaintiff has sold the security.*

*Id.* (emphasis supplied).

195.   As a consequence of their violations of Florida securities law, Defendants are joint and severally liable for rescissionary damages and interest at the legal rate, attorneys' fees, and costs.

**SECOND CLAIM FOR RELIEF**
**Arizona Statutory Securities Fraud**
**Against Kelly, Sears, Antonio-Sears, Picasso Group, American Senior, Gray, Family Tree,**
**Wooten, LaDuca, Mason, Stevenson, American Security, American Investments, Elliott,**
**Elliott Financial, Elliott LLC, Spillman, Wealth Protection, Financial Group, and**
**Runninger**

196.     Plaintiffs the Hannens, Schoch, the Rubinsteins, Toone, Smith, Webb, Tuggle, Kujawa, the Hoffsetters, the Alberts, and the Benzes (the "Arizona Plaintiffs") and Hammon repeat and re-allege each and every allegation contained in Paragraphs 1 through 195 as if fully set forth herein.

197.     The investments EquiAlt sold to the Arizona Plaintiffs and Hammon are securities under A.R.S § 1801(26).

198.     In connection with the offer and sale of the securities, Kelly, Sears, and Antonio-Sears directly or indirectly engaged in the following acts:

a.   Employed a devise, scheme or artifice to defraud, in violation of A.R.S. § 44-1991(A)(1);

b.   Made untrue statements of material fact, and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of A.R.S. § 44-1991(A)(2);

c.   Engaged in transactions, practices, and courses of business, which operate as a fraud or deceit, in violation of A.R.S. § 44-1991(A)(3).

199.     Pursuant to A.R.S. § 44-2001, the EquiAlt Debenture are voidable, and the Arizona Plaintiffs and Hammon are entitled to their principal and interest, together with taxable court costs, and reasonable attorneys' fees.

200.     Kelly, Sears, and Antonio-Sears are liable as control persons of EquiAlt and/or the Funds pursuant to A.R.S. § 44-1999.

201.    Kelly, Sears, Antonio-Sears, Picasso Group, American Senior, Gray, Family Tree, Wooten, LaDuca, Mason, Stevenson, American Security, American Investments, Elliott, Elliott Financial, Elliott LLC, Spillman, Wealth Protection, Financial Group, and Runninger knowingly or recklessly, directly or indirectly, made, participated in and/or induced separate and independent violations of A.R.S. § 44-1991(A). They are joint and severally liable as persons who offered and/or sold securities and/or aided and abetted and/or conspired with one another. They are liable for these violations of A.R.S. § 44-1991, pursuant to A.R.S. §§ 44-2001 and 44-2003(A).

202.    The securities fraud described herein damaged the Arizona Plaintiffs and Hammon and caused their losses.

203.    As a consequence of their violations of Arizona securities law, Kelly, Sears, Antonio-Sears, Picasso Group, American Senior, Gray, Family Tree, Wooten, LaDuca, Mason, Stevenson, American Security, American Investments, Elliott, Elliott Financial, Elliott LLC, Spillman, Wealth Protection, Financial Group, and Runninger are joint and severally liable for rescissionary damages and interest at the legal rate, pursuant to A.R.S. § 44-2001(A); attorneys' fees, pursuant to A.R.S. § 44-2001(A); and costs, pursuant to A.R.S. § 44-2001(A).

### THIRD CLAIM FOR RELIEF
**California Statutory Securities Fraud**
**Against Kelly, Sears, Antonio-Sears, Picasso Group, Family Tree, Wooten, Armijo, Joseph LLC, Joseph Financial, Mohr, Mohr Inc., Mohr LLC, Spillman, Wealth Protection, Lifeline, Marques, and Talbot**

204.    Plaintiffs Hammon, Murphy, Wong, and Mogensen (the "California Plaintiffs") and the Hoffsetters refer to Paragraphs 1 through 195 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

205.    The investments EquiAlt sold to the California Plaintiffs and the Hoffsetters are securities under Cal. Corp. Code § 25019.

206.     In connection with the offer and sale of the securities, Kelly, Sears, Antonio-Sears, Picasso Group, Family Tree, Wooten, Armijo, Joseph LLC, Joseph Financial, Mohr, Mohr Inc., Mohr LLC, Spillman, Wealth Protection, Lifeline, Marques, and Talbot directly or indirectly made untrue statements of material fact, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Cal. Corp. Code § 25401.

207.     Kelly, Sears, and Antonio-Sears are joint and severally liable as control persons of EquiAlt and the Funds pursuant to Cal. Corp. Code. § 25504. At all material times, Kelly, Sears, and Antonio-Sears had the legal authority to control the actions of EquiAlt, the Funds, and the employees.

208.     Kelly, Sears, Antonio-Sears, Picasso Group, Family Tree, Wooten, LaDuca, Mason, Armijo, Joseph LLC, Joseph Financial, Mohr, Mohr Inc., Mohr LLC, Spillman, Wealth Protection, Lifeline, Marques, and Talbot are also joint and severally liable under Cal. Corp. Code. § 25504.1 as they each materially aided in the acts constituting the securities fraud violations with the intent to deceive or defraud the California Plaintiffs and the Hoffsetters.

209.     The securities fraud described herein damaged the California Plaintiffs and the Hoffsetters and caused their losses.

210.     As a consequence of their violation of California securities law, Kelly, Sears, Antonio-Sears, Picasso Group, Family Tree, Wooten, LaDuca, Mason, Armijo, Joseph LLC, Joseph Financial, Mohr, Mohr Inc., Mohr LLC, Spillman, Wealth Protection, Lifeline, Marques, and Talbot are joint and severally liable for rescissionary damages and interest at the legal rate, pursuant to Cal. Cop. Code § 25501 and costs.

## FOURTH CLAIM FOR RELIEF
### Nevada Statutory Securities Fraud
### Against Kelly, Sears, Antonio-Sears, and Picasso Group

211.     Plaintiffs the Gleinns and the Hannens refer to Paragraphs 1 through 195 of the Complaint, inclusive, and incorporates them by reference as though set forth in full.

212.     The EquiAlt investments are securities as defined in NRS 90.295.

213.     As alleged above, Defendant Kelly, Defendant Antonio-Sears and Defendant Sears directly or indirectly engaged in the following acts connection with the offer and sale of the EquiAlt securities to the Nevada Plaintiff in Nevada:

a.     Employed a devise, scheme or artifice to defraud, in violation of NRS 90.570(1);

b.     Made untrue statements of material fact, and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of NRS 90.570(2));

c.     Engaged in transactions, practices, and courses of business, which operate as a fraud or deceit, in violation of NRS 90.570(3).

214.     The securities fraud alleged herein damaged the Gleinns and the Hannens and caused their losses.

215.     NRS 90.660 provides the following relief for violations of NRS 90.570:

Upon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this State from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security. A purchaser who no longer owns the security may recover damages. Damages are the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of this State from the date of disposition of the security, costs and reasonable attorney's fees determined by the court. Tender requires only notice of willingness to exchange the security for the amount specified.

216.    Defendant Kelly, Defendant Antonio-Sears, and Defendant Sears are liable to the Gleinns and the Hannens for their violations of NRS 90.570(1), (2) & (3) to the extent provided in NRS 90.660(1).

217.    Defendant Kelly, Defendant Antonio-Sears, and Defendant Sears are alternatively liable to the Gleinns and the Hannens as "control persons" of EquiAlt and/or the Funds pursuant to NRS 90.660(4).

218.    Defendants Kelly, Sears, Antonio-Sears, and Picasso Group, are liable to the Gleinns and the Hannens as "a broker-dealer or sales representative who materially aids in the act, omission or transaction constituting the violation," pursuant to NRS § 90.660(4).

219.    As a consequence of the violation of Nevada Securities Law, Kelly, Sears, Antonio-Sears, and the Picasso Group are joint and severally liable for rescissionary damages and interest at the legal rate, costs, and reasonable attorneys' fees pursuant to NRS § 90.660(1).

### FIFTH CLAIM FOR RELIEF
### Sale of Unregistered Securities, §§ 517.07, 517.211, Fla. Stat.
### Against All Kelly, Allstate Financial, Brown, Picasso Group, Sears, and Antonio-Sears

220.    Plaintiffs repeats and re-allege each and every allegation contained in Paragraphs 1-195 as if fully set forth herein.

221.    This is an action against Kelly, Allstate Financial, Brown, Picasso Group, Sears, and Antonio-Sears on behalf of purchasers of EquiAlt securities within Florida.

222.    FSIPA applies because there is a territorial nexus to the State of Florida: EquiAlt, the seller/issuer of the securities, operated in Tampa, Florida, and sold its securities from Florida via its agents who operated both in Florida, and outside of Florida. Florida has a legitimate interest in eliminating a base of fraudulent operations located within its borders.

223.    Defendants' conduct constitutes a violation of section 517.07, Florida Statutes. Specifically, the EquiAlt securities (referred to as Debentures) that were sold by EquiAlt were not registered with the Office of Financial Regulation of the Financial Services Commission of the State of Florida, contrary to the requirements section 517.07. Furthermore, these securities were not exempt under section 517.051, Florida Statutes; were not sold in a transaction exempt under section 517.601, Florida Statutes; and are not federal covered securities.

224.    As a consequence of the violation of Florida's securities laws, Kelly, Allstate Financial, Brown, Picasso Group, Sears, and Antonio-Sears are joint and severally liable for rescissionary damages and interest at the legal rate, costs, and reasonable attorneys' fees pursuant to section 517.211, Florida Statutes.

### SIXTH CLAIM FOR RELIEF
**Sale of Unregistered Securities, A.R.S. § 44-1841**
**Against Sears, Antonio-Sears, Picasso Group, American Senior, Gray, Family Tree, Wooten, LaDuca, Mason, Stevenson, American Security, American Investments, Elliott, Elliott Financial, Elliott LLC, Spillman, Wealth Protection, Financial Group, and Runninger**

225.    The Arizona Plaintiffs and Hammon refer to Paragraphs 1 through 195 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

226.    Sears, Antonio-Sears, Picasso Group, American Senior, Gray, Family Tree, Wooten, LaDuca, Mason, Stevenson, American Security, American Investments, Elliott, Elliott Financial, Elliott LLC, Spillman, Wealth Protection, Financial Group, and Runninger offered and/or sold securities in the form of the EquiAlt Debentures within or from the State of Arizona.

227.    The securities were neither registered nor exempt from registration. Accordingly, their offer and sale in Arizona was unlawful under A.R.S. § 44-1841.

228.    As a consequence of their sale of unregistered securities, Sears, Antonio-Sears, Picasso Group, American Senior, Gray, Family Tree, Wooten, LaDuca, Mason, Stevenson,

American Security, American Investments, Elliott, Elliott Financial, Elliott LLC, Spillman, Wealth Protection, Financial Group, and Runninger  are liable, jointly and severally, for rescissionary damages and interest at the legal rate, pursuant to A.R.S. § 44-2001(A); attorneys' fees, pursuant to A.R.S. § 44-2001(A); and costs, pursuant to A.R.S. § 44-2001(A).

## SEVENTH CLAIM FOR RELIEF
### Sale of Unregistered Securities, Cal. Corp. Code § 25110
### Against Family Tree, Wooten, Armijo, Joseph LLC, Joseph Financial, Mohr, Mohr Inc., Mohr LLC, Spillman, Wealth Protection, Lifeline, Marques, and Talbot

229.     The California Plaintiffs and the Hoffsetters refer to Paragraphs 1 through 195 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

230.     Family Tree, Wooten, LaDuca, Mason, Armijo, Joseph LLC, Joseph Financial, Mohr, Mohr Inc., Mohr LLC, Spillman, Wealth Protection, Lifeline, Marques, and Talbot offered and/or sold securities in the form of the EquiAlt Debentures within or from the State of California.

231.     The securities were not registered or exempt from registration. Accordingly, their offer and sale in California was unlawful under California Corp. Code § 25110.

232.     As a consequence of their sale of unregistered securities, Family Tree, Wooten, LaDuca, Mason, Armijo, Joseph LLC, Joseph Financial, Mohr, Mohr Inc., Mohr LLC, Spillman, Wealth Protection, Lifeline, Marques, and Talbot are liable, jointly and severally, for rescissionary damages and interest at the legal rate, pursuant to Cal. Corp. Code § 25503, and costs.

## EIGHTH CLAIM FOR RELIEF
### Nevada Sale of Unregistered Securities, NRS 90.460
### Against Picasso Group, Sears, Antonio-Sears, Mohr, Mohr LLC, and Mohr Inc.

233.     The Gleinns and the Hannens refer to Paragraphs 1 through 195 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

234.     Picasso Group, Sears, and Antonio-Sears, offered and sold the EquiAlt securities in or from Nevada, which were neither registered nor exempt from registration as required by Nevada law.

235.     The offer and sale of the unregistered EquiAlt securities to the Gleinns and the Hannens from and/or in Nevada was thus unlawful under NRS 90.460.

236.     NRS 90.660 provides the following relief for violations of NRS 90.460:

Upon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this State from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security. A purchaser who no longer owns the security may recover damages. Damages are the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of this State from the date of disposition of the security, costs and reasonable attorney's fees determined by the court. Tender requires only notice of willingness to exchange the security for the amount specified.

237.     As a consequence of their sale of unregistered securities, Picasso Group, Sears, and Antonio-Sears, are liable to the Gleinns, and the Hannens for their violation of NRS 90.460 to the extent provided in NRS 90.660(1), including for rescissionary damages and interest, attorneys' fees and costs.

**<u>NINTH CLAIM FOR RELIEF</u>**
**Sale of Securities by Unauthorized Broker-Dealers – Florida**
**Against Kelly, Allstate Financial, Brown, Picasso Group, Sears, and Antonio-Sears**

238.     Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1-195 as if fully set forth herein.

239.     This is an action against the Defendants who sold EquiAlt securities either from offices in the state of Florida, or to persons in the State of Florida: Kelly, Allstate Financial, Brown, Picasso Group, Sears, and Antonio-Sears.

240.     Section 517.12, Florida Statutes states in part:

Registration of dealers, associated persons, intermediaries, and investment advisers.—

(1)   No dealer, associated person, or issuer of securities shall sell or offer for sale any securities in or from offices in this state, or sell securities to persons in this state from offices outside this state, by mail or otherwise, unless the person has been registered with the office pursuant to the provisions of this section.

(4)   No investment adviser or associated person of an investment adviser or federal covered adviser shall engage in business from offices in this state, or render investment advice to persons of this state, by mail or otherwise, unless the federal covered adviser has made a notice-filing with the office pursuant to s. 517.1201 or the investment adviser is registered pursuant to the provisions of this chapter and associated persons of the federal covered adviser or investment adviser have been registered with the office pursuant to this section. The office shall not register any person or an associated person of a federal covered adviser or an investment adviser unless the federal covered adviser or investment adviser with which the applicant seeks registration is in compliance with the notice-filing requirements of s. 517.1201 or is lawfully registered with the office pursuant to this chapter. A dealer or associated person who is registered pursuant to this section may render investment advice upon notification to and approval from the office.

(5)   No dealer or investment adviser shall conduct business from a branch office within this state unless the branch office is notice-filed with the office pursuant to s. 517.1202.

(20)   An intermediary may not engage in business in this state unless the intermediary is registered as a dealer or as an intermediary with the office pursuant to this section to facilitate the offer or sale of securities in accordance with s. 517.0611. "Intermediary" means a natural person residing in the state or a corporation, trust, partnership, association, or other legal entity registered with the Secretary of State to do business in the state, which facilitates the offer or sale of securities under s. 517.0611.

*See* § 517.021(13), Fla. Stat.

241.   FSIPA applies because there is a territorial nexus to the State of Florida: EquiAlt, the seller/issuer of the securities, operated in Tampa, Florida, and sold its securities from Florida via its agents who operated both in Florida, and outside of Florida. Florida has a legitimate interest in eliminating a base of fraudulent operations located within its borders.

242.   Defendants who sold EquiAlt securities to persons in Florida or who operated from Florida violated of section 517.12, Florida Statutes. because they violated section 517.12, by, but not limited to, failing to obtain their license, or were not registered with the Office of Financial

Regulation, State of Florida; or, they failed to register via a notice filing. *See* §§ Fla Stat. 517.12(4), 517.1201, & 517.1205, Fla. Stat.

243.    As a consequence of the violation of Florida's securities laws, Kelly, Allstate Financial, Brown, Picasso Group, Sears, and Antonio-Sears are joint and severally liable for rescissionary damages and interest at the legal rate, costs, and reasonable attorneys' fees pursuant to section 517.211, Florida Statutes.

**TENTH CLAIM FOR RELIEF**
**Sale of Securities by Unregistered Salesmen, A.R.S. § 44-1482**
**Sears, Antonio-Sears, Picasso Group, American Senior, Gray, Family Tree, Wooten, LaDuca, Mason, Stevenson, American Security, American Investments, Elliott, Elliott Financial, Elliott LLC, Spillman, Wealth Protection, Financial Group, and Runninger**

244.    The Arizona Plaintiffs and Hammon refer to Paragraphs 1 through 195 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

245.    Sears, Antonio-Sears, Picasso Group, American Senior, Gray, Family Tree, Wooten, LaDuca, Mason, Stevenson, American Security, American Investments, Elliott, Elliott Financial, Elliott LLC, Spillman, Wealth Protection, Financial Group, and Runninger offered and/or sold securities in the form of the EquiAlt Debentures within or from Arizona.

246.    In connection with the offer and/or sale of the loan agreements, Sears, Antonio-Sears, Picasso Group, American Senior, Gray, Family Tree, Wooten, LaDuca, Mason, Stevenson, American Security, American Investments, Elliott, Elliott Financial, Elliott LLC, Spillman, Wealth Protection, Financial Group, and Runninger acted as either "dealers or "salesmen" as defined by A.R.S. §44-1801.

247.    Upon information and belief, Sears, Antonio-Sears, Picasso Group, American Senior, Gray, Family Tree, Wooten, LaDuca, Mason, Stevenson, American Security, American Investments, Elliott, Elliott Financial, Elliott LLC, Spillman, Wealth Protection, Financial Group,

and Runninger were not registered in Arizona to offer or sell securities as required by A.R.S. § 44-1842.

248.    As consequence of their violations of A.R.S. § 44-1482, Sears, Antonio-Sears, Picasso Group, American Senior, Gray, Family Tree, Wooten, LaDuca, Mason, Stevenson, American Security, American Investments, Elliott, Elliott Financial, Elliott LLC, Spillman, Wealth Protection, Financial Group, and Runninger are liable, jointly and severally, for rescissionary damages and interest at the legal rate, pursuant to A.R.S. § 44-2001(A); attorneys' fees, pursuant to A.R.S. § 44-2001(A); and costs, pursuant to A.R.S. § 44-2001(A).

## ELEVENTH CLAIM FOR RELIEF
### Sale of Securities by Unauthorized Broker-Dealers – Cal. Corp. Code § 25210(a) Against Family Tree, Wooten, Armijo, Joseph LLC, Joseph Financial, Mohr, Mohr Inc., Mohr LLC, Spillman, Wealth Protection, Lifeline, Marques, and Talbot

249.    The California Plaintiffs and the Hoffsetters refer to Paragraphs 1 through 195 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

250.    Family Tree, Wooten, Armijo, Joseph LLC, Joseph Financial, Mohr, Mohr Inc., Mohr LLC, Spillman, Wealth Protection, Lifeline, Marques, and Talbot offered and/or sold securities in the form of the EquiAlt Debentures within or from California.

251.    In connection with the offer and/or sale of the loan agreements, Family Tree, Wooten, Armijo, Joseph LLC, Joseph Financial, Mohr, Mohr Inc., Mohr LLC, Spillman, Wealth Protection, Lifeline, Marques, and Talbot acted as "broker-dealers" as defined by Cal. Corp. Code § 25044.

252.    Upon information and belief, Family Tree, Wooten, Armijo, Joseph LLC, Joseph Financial, Mohr, Mohr Inc., Mohr LLC, Spillman, Wealth Protection, Lifeline, Marques, and Talbot were not registered in Arizona to offer or sell securities as required by Cal. Corp. Code § 25501.5(a)(1).

253.    As a consequence of their sale of unregistered securities, Sears, Antonio-Sears, Picasso Group, Family Tree, Wooten, Armijo, Joseph LLC, Joseph Financial, Mohr, Mohr Inc., Mohr LLC, Spillman, Wealth Protection, Lifeline, Marques, and Talbot are liable, jointly and severally, for rescissionary damages and interest at the legal rate, pursuant to Cal. Corp. Code § 25503, and costs.

## TWELFTH CLAIM FOR RELIEF
### Nevada Sale of Securities by Unregistered Salesperson, NRS 90.310
### Against Picasso Group, Sears, and Antonio-Sears

254.    The Hannens and the Gleinns refer to Paragraphs 1 through 195 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

255.    NRS 90.310(1) provides: "It is unlawful for any person to transact business in this State as a broker-dealer or sales representative unless licensed or exempt from licensing under this chapter." NRS 90.310(3) provides: "It is unlawful for any person to transact business in this State as a transfer agent unless licensed or exempt from licensing under this chapter."

256.    Picasso Group, Sears, and Antonio-Sears offered and sold the EquiAlt securities to the Hannens and the Gleinns from the State of Nevada without being licensed as a broker-dealer, sales representative, or transfer agent as required by Nevada law. Accordingly, their offer and sale of the EquiAlt securities to the Hannens and the Gleinns was unlawful under NRS 90.310.

257.    NRS 90.660 provides the following relief for violations of NRS 90.310:

Upon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this State from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security. A purchaser who no longer owns the security may recover damages. Damages are the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of this State from the date of disposition of the security, costs and reasonable attorney's fees determined by the court. Tender requires only notice of willingness to exchange the security for the amount specified.

258.   As a consequence of their sale of unregistered securities, Picasso Group, Sears, and Antonio-Sears are liable to the Hannens and the Gleinns for their violation of NRS 90.460 to the extent provided in NRS 90.660(1), including rescissionary damages and interest, attorneys' fees, and costs.

### THIRTEENTH CLAIM FOR RELIEF
**Nevada Breach of Statutory Fiduciary Duty under NRS 90.575**
**Against Picasso Group, Sears, and Antonio-Sears**

259.   The Gleinns and the Hannens refer to Paragraphs 1 through 195 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

260.   NRS 90.575 provides: "A broker-dealer, sales representative, investment adviser or representative of an investment adviser shall not violate the fiduciary duty toward a client imposed by NRS 628A.020." NRS 628A.020 in turn provides:

> A financial planner has the duty of a fiduciary toward a client. A financial planner shall disclose to a client, at the time advice is given, any gain the financial planner may receive, such as profit or commission, if the advice is followed. A financial planner shall make diligent inquiry of each client to ascertain initially, and keep currently informed concerning, the client's financial circumstances and obligations and the client's present and anticipated obligations to and goals for his or her family.

261.   Picasso Group, Sears, and Antonio-Sears breached the fiduciary duties they owed to the Wong, the Gleinns, and the Hannens under NRS 90.575 and NRS 628A.020 by, among other things, failing to disclose to them the gains, profits and commissions they received in connection with the sale of the EquiAlt securities.

262.   As a consequence of the Picasso Group, Sears, and Antonio-Sears' breaches of fiduciary duty, the Hannens and the Gleinns have suffered damages in an amount to be proven at trial, including the loss of money invested in the EquiAlt securities.

**FOURTEENTH CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**Asserted on Behalf of the Respective States Classes, Against All Defendants**

263.    Plaintiffs refer to Paragraphs 1 through 195 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

264.    Defendants acted as investment advisers, financial advisers and/or as licensed or unlicensed brokers in the sale of EquiAlt Debentures to the Plaintiffs and the Class.

265.    Defendants, upon information and belief, uniformly assured Plaintiffs and other investors that they were experienced financial advisors in a superior position to Plaintiffs, such that they were able to recommend investments suitable for Plaintiffs' financial needs and circumstances, including their investment objectives and risk tolerance.

266.    Upon information and belief, Defendants represented EquiAlt to be, in so many words, a sound or safe investment fully backed by income producing real estate.

267.    As investment advisers, financial advisers and/or as licensed or unlicensed brokers, the Defendants owe a common law fiduciary duty to the Plaintiffs and the Class as follows:

(a) the duty to recommend investments only after studying it sufficiently to become informed as to its nature, price, and financial prognosis;

(b) the duty to perform the customer's orders promptly in a manner best suited to serve the customer's interests;

(c) the duty to inform the customer of the risks involved in purchasing or selling a particular security;

(d) the duty to refrain from self-dealing;

(e) the duty not to misrepresent any material fact to the transaction; and

(f) the duty to transact business only after receiving approval from the customer.

268.     Defendants also breached their fiduciary duty where they ignored red flags, such as:  a) the EquiAlt Securities were unregistered; b) EquiAlt was not licensed as a broker-dealer with any state or federal regulator to sell securities; c) there was not enough real estate to back all the investor money raised by EquiAlt; d) in October of 2018, a public search of the internet on EquiAlt would have revealed that the California Department of Business Oversight had published a Desist and Refrain Order against Ben Mohr, stating that Mr. Mohr and Ben Mohr Inc. were not licensed to sell EquiAlt (and other) securities in California; the California <u>Desist and Refrain</u> order was a clear red flag placing Defendants on notice that investment advsiers or selling agents needed to be licensed to sell EquiAlt and that EquiAlt was considered a security by California's securities regulator.

269.     Defendants are vicariously liable for the acts of their officers who acted as their actual or apparent agents.

270.     The breaches of fiduciary duty caused damages to the Plaintiffs and the Class.

## FIFTEENTH CLAIM FOR RELIEF
### Negligent Misrepresentation
**Asserted on Behalf of the Respective States Classes, Against All Defendants**

271.     Plaintiffs refer to Paragraphs 1 through 195 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

272.     Defendants, in the course of their business, profession, and employment, and as part of transactions in which they had a pecuniary interest, misrepresented or omitted material facts in purporting to supply information to Plaintiffs for their guidance in purchasing the EquiAlt Debentures.

273.     Defendants intended that Plaintiffs rely on the information and provided it for that purpose.

274.     Defendants failed to exercise reasonable care or competence in obtaining and communicating the misrepresented and/or omitted facts to Plaintiffs.

275.     Plaintiffs justifiable relied upon Defendants' false misrepresentations and omissions in entering into the respective EquiAlt Debentures.

276.     As a direct and proximate result of Defendants' misrepresentations and omissions, and Plaintiffs' reliance thereon, Plaintiffs suffered direct and consequential losses, including the loss of their principal and interest under the EquiAlt Debentures.

277.     Defendants' conduct was aggravated and outrageous, guided by evil motivates and with a willful and wanton disregard for Plaintiffs' interests, justifying an award of punitive damages.

278.     As a consequence of their negligent misrepresentations, Defendants are joint and severally liable for actual damages, in an amount to be proven at trial, punitive damages, the costs of collection, litigation expenses, and recoverable costs, and pre- and post-judgment interest at the maximum prevailing statutory rate.

**SIXTEENTH CLAIM FOR RELIEF**
**Negligence**
**Asserted on behalf of the Respective State Classes, Against All Defendants**

279.     Plaintiffs refer to Paragraphs 1 through 195 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

280.     Each Defendant who recommended or sold EquiAlt securities had a duty of reasonable care to the Plaintiffs.

281.     Defendants that sold EquiAlt securities held themselves out as knowledgeable about investments to the Plaintiffs and, specifically, about EquiAlt's business. These Defendants

represented to Plaintiffs that they should trust their judgment that EquiAlt was a sound investment when, in fact, it was a Ponzi Scheme.

282.   Defendants were paid a commission by EquiAlt for selling EquiAlt Securities.

283.   Defendants' duty of reasonable care included a duty of due diligence, because investment and financial advisors who recommend securities have a duty to only recommend suitable investments after they have studied them for the purpose of ensuring the investments are suitable for their customers.

284.   Defendants who recommended and sold EquiAlt securities, or aided EquiAlt in making sales, were negligent in conducting due diligence before they actually recommended or sold the EquiAlt securities.

285.   Defendants could not satisfy their duty of due diligence by merely relying upon EquiAlt's own sales materials.

286.   Upon information and belief, Defendants who sold EquiAlt Securities did little to no due diligence beyond relying on EquiAlt's own sales materials and representations regarding the details of EquiAlt's real estate and EquiAlt's ability to raise money by selling private placement investments that were not registered as securities with any state or federal regulator.

287.   Defendants ignored red flags which should have alerted them that more due diligence was required to assure EquiAlt was a sound investment, including: a) EquiAlt Securities were unregistered; b) EquiAlt was not licensed as a broker-dealer with any state or federal regulator to sell securities; c) there was not enough real estate to back all the investor money raised by EquiAlt; d) in October of 2018, a public search of the internet on EquiAlt would have revealed that the California Department of Business Oversight had published a Desist and Refrain Order against Ben Mohr, stating that Mr. Mohr and Ben Mohr Inc. were not licensed to sell EquiAlt (and

other) securities in California; the California order was a clear red flag that investment advisers or selling agents needed to be licensed to sell EquiAlt and that EquiAlt was considered a security by California's securities regulator, and as such, would likely be viewed the same way as other state or federal regulators.

288.   Had Defendants conducted basic due diligence by contacting any state or federal securities regulators or by hiring competent securities counsel, they would have learned that a) financial advisors and selling agents need to be registered to sell securities such as EquiAlt; b) that EquiAlt securities were not registered, and c) EquiAlt securities were not properly exempt from registration.

289.   Further, had Defendants required EquiAlt to provide transparency, such as audited financial statements, they likely would have learned that EquiAlt did not have sufficient real estate income to pay the promised returns and principal back to investors, the commissions to advisors, the overhead of EquiAlt, and the tens of millions taken by its principals from investor monies.

290.   Defendants who sold EquiAlt securities were also negligent because they failed to ensure they were properly registered as financial advisors or investment advisors in the states in which they had offices, and in the states where their customers were located.

291.   Defendants were also negligent because they failed to ensure that the EquiAlt securities were registered, or were properly exempt from registration.

292.   Defendants who worked for EquiAlt, such as Tony Kelly and Andre Sears, were also negligent because as EquiAlt in-house agents or employees, they should have ensured that the EquiAlt securities that they sold or helped sell were properly registered or exempt from registration, were fully backed by real estate, as promised by EquiAlt, and could be sold by unlicensed agents. Nevertheless, none of the agents were registered, the EquiAlt securities were

not registered or were exempt from registration; and according to SEC exhibits submitted to the

Court in SEC vs. EquiAlt, EquiAlt only held approximately $55 million in real estate, when $171

million of investor money was raised by EquiAlt, at the time the SEC halted sales of EquiAlt

securities.

293.     Defendants' negligence was the proximate cause of the Plaintiffs' damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Classes, pray for an order

and judgment against Defendants and in their favor as follows:

A.     certifying the Classes as set forth in this Complaint, and appointing Plaintiffs as

Class Representatives for these Classes;

B.     enjoining Defendants from further violations of their legal and fiduciary duties;

C.     awarding Plaintiffs and the Classes rescission;

D.     awarding Plaintiffs and the Classes restitution with interest at the legal rate;

E.     awarding Plaintiffs and the Classes monetary damages and interest at the legal

rate;

F.     awarding Plaintiffs and the Classes the costs and disbursements of this action,

including reasonable counsel fees, costs and expenses in amounts to be determined by the Court;

G.     awarding pre- and post-judgment interest; and

H.     granting such other and further relief as is just and proper.

## REQUEST FOR JURY TRIAL

Plaintiffs hereby request a trial by jury on all issues.

Respectfully submitted this 8th day of April, 2020.

By: s/ Adam M. Moskowitz
Adam M. Moskowitz, Esq.
Fla. Bar No. 984280
Adam@moskowitz-law.com
Adam A. Schwartzbaum
Fla. Bar No. 93014
Adams@moskowitz-law.com
**The Moskowitz Law Firm, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, Florida 33134
Telephone:  (305) 740-1423
Facsimile:  (786) 298-5737

Jeffrey R. Sonn, Esq.
Fla. Bar. No. 773514
jsonn@sonnlaw.com
**Sonn Law Group**
One Turnberry Place
19495 Biscayne Blvd. Suite 607
Aventura, FL 33180
Tel. 305-912-3000
Fax: 786-485-1501

Andrew S. Friedman, Esq.
(admitted pro hac vice)
afriedman@BFFB.com
Francis J. Balint, Jr., Esq.
(admitted pro hac vice)
fbalint@BFFB.com
**Bonnett Fairbourn Friedman & Balint, P.C.**
2325 E. Camelback Rd., Suite 300
Phoenix, AZ 85016
Telephone:  (602) 274-1100
Facsimile:  (602) 274-1199

Attorneys for Plaintiff

68

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the forgoing was filed on April 8, 2020 with

the Court via CM/ECF system, which will send notification of such filing to all attorneys of record.

By: *<u>/s/ Adam M. Moskowitz</u>*
ADAM M. MOSKOWITZ
Florida Bar No. 984280